# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D2024-2217
Lower Tribunal No. 2022-CA-001430

_____

MICHAEL JOHN CRECELIUS,

Appellant/Cross-Appellee,

v.

MILDRED RIZZITANO, as Personal Representative of the ESTATE OF ROBERT ANTHONY ALVES, JR., deceased,

Appellee/Cross-Appellant.

_____

Appeal from the Circuit Court for Lee County.
Keith R. Kyle, Judge.

February 27, 2026

**<u>EN BANC</u>**

MIZE, J.

The Florida Supreme Court issued its decision in *Binger v. King Pest Control* in 1981. 401 So. 2d 1310 (Fla. 1981). Since *Binger* was decided, our fellow district courts have misapplied the opinion in a manner that has severely hampered the ability of trial judges to effectively manage civil lawsuits and accomplish the primary goals of our civil discovery rules – to prevent surprises at trial and to assist

in arriving at the truth. This opinion explains where our sister courts went wrong on *Binger*.

## I. *Binger* and its Progeny

### (a) The *Binger* opinion

The plaintiffs in *Binger* failed to disclose an expert witness prior to trial as required by a pretrial order. 401 So. 2d at 1311. Specifically, the pretrial order at issue in *Binger* required each party to disclose its witness list at least twenty days before the trial. *Id.* Both parties served witness lists by the required deadline. *Id.* The plaintiffs listed their primary witnesses by name but also "advised that they would call to testify 'any and all necessary' impeachment or rebuttal witnesses." *Id.* Over a month before the trial, and before the witness disclosure deadline, the defendant filed an amended witness list identifying an accident reconstruction expert that had not been previously disclosed. *Id.* The plaintiffs took the expert's deposition four days before the trial but did not disclose any counter-expert to the defendant. *Id.* After the defendant's expert testified at trial, the plaintiffs sought to introduce their own previously undisclosed expert to impeach the defendant's expert. *Id.* Over the defendant's objection, the trial court allowed the plaintiffs to introduce testimony from their previously undisclosed expert. *Id.*

After the jury returned a verdict for the plaintiffs, the defendant successfully appealed to the Fourth District Court of Appeal and obtained a reversal of the

judgment and a remand for a new trial. *Id.* The plaintiffs appealed to the Florida Supreme Court. The plaintiffs argued to the Supreme Court that the trial court was correct to allow their undisclosed witness to testify because impeachment witnesses were not required to be disclosed prior to trial. *Id.* at 1311-12. The defendant argued that the rule permitting nondisclosure of impeachment witnesses only applied to "situations in which the need for an impeachment witness is totally unforeseeable and arises from matters which come out for the first time during trial." *Id.* at 1312.

In beginning its opinion, the Florida Supreme Court noted that there then existed a conflict among the district courts of appeal "regarding the effect of a pretrial failure to disclose the names of witnesses," and that the district courts had taken four approaches. *Id.* at 1311, 1312. Some district court cases held "that a witness need not be disclosed if he is an 'impeachment' witness." *Id.* at 1312. At least one district court opinion held that "subject to the trial judge's discretion, a 'rebuttal' witness need not be disclosed prior to trial." *Id.* "Yet another [district court] case suggest[ed] that a witness need not be disclosed if he will respond to any new or surprise testimony brought out at trial." *Id.* The Florida Supreme Court concluded that none of these approaches was "adequate to furnish practical rules which can be used by the Bench and Bar to resolve this thorny problem in the midst of a trial." *Id.* at 1312-13 (quoting *King Pest Control v. Binger*, 379 So. 2d 660, 662 (Fla. 4th DCA 1980)). The Court endorsed the fourth approach it identified in the

3

case law, which was to "place[] all problems regarding the testimony of undisclosed witnesses within the broad discretion of the trial judge" thereby vesting "in the trial judge the interpretation and enforcement of any pretrial order mandating witness disclosure, and limit[ing] reviewing courts to reversals only in cases of a clear showing of abuse prejudicial to the affected party." *Binger*, 401 So. 2d at 1313.

The Court found that its chosen approach was consistent with "the general policy of full and open disclosure" enshrined in Florida's discovery rules and that it would best further the goals of those rules, which the Court stated were "to eliminate surprise, to encourage settlement, and to assist in arriving at the truth." *Id.* (quoting *Spencer v. Beverly*, 307 So. 2d 461, 462 (Fla. 4th DCA 1975) (Downey, J., concurring), *cert. denied*, 314 So. 2d 590 (Fla. 1975)). Consistent with these goals, the Court held "that a pretrial order directing the parties to exchange the names of witnesses requires a listing or notification of all witnesses that the parties reasonably foresee will be called to testify, whether for substantive, corroborative, impeachment or rebuttal purposes." *Binger*, 401 So. 2d at 1313. The Court specifically rejected any distinction between impeachment witnesses, including expert impeachment witnesses, and other types of witnesses, and the Court expressly disapproved of cases that had drawn such a distinction. *Id.* The Court went on to state:

> It follows, of course, that a trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by a

4

determination as to whether use of the undisclosed witness will prejudice the objecting party. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

*Id.* at 1313-14. While the above paragraph has been quoted repeatedly by our sister courts, the Court did not stop there. The Court continued:

We cannot talk about pretrial discovery without mentioning local pretrial practices. We have intentionally left room for the operation of local rules and customs within the broad parameters of our decision. Local customs regarding pretrial disclosure of witnesses vary throughout the circuits in Florida, and these variations can and should continue. For example, in some circuits the pretrial disclosure order not only directs that witnesses' names be exchanged, but expressly prevents the testimony of any witness not identified within a certain period of time. In other circuits, it is common for the order to exempt by category certain types of witnesses from being listed. Another local practice requires that counsel for each party demand witnesses' names before a court order is entered or in lieu of a court-directed exchange of names. These local variations in discovery practice within the circuits of Florida in no way derogate from our decision, and we leave their interpretation and application, within the stated goals of discovery, to the presiding trial judge in each case.

*Id.* at 1314. As to the parties in *Binger* itself, the Florida Supreme Court found that the plaintiffs should have disclosed their expert witness as required by the trial

5

court's pretrial order and that the defendant was prejudiced by their failure to do so. *Id.* at 1314-15. Because the defendant was prejudiced by the plaintiffs' failure to disclose their expert witness, the trial court erred by allowing the witness to testify. *Id.* The Florida Supreme Court affirmed the decision of the Fourth District overturning the judgment and granting the defendant a new trial. *Id.*

   **(b) The *Binger* expansion**

   Since the Florida Supreme Court decided *Binger*, our sister courts have done two things. First, they have treated the Supreme Court's statement – that if the trial court finds that the undisclosed witness will not prejudice the other party after considering the factors listed in *Binger*, then the witness should be allowed to testify – as a binding holding. *See, e.g.*, *Allstate Prop. & Cas. Ins. v. Lewis*, 14 So. 3d 1230, 1234 (Fla. 1st DCA 2009) ("The supreme court's opinion in *Binger* is clear that testimony should be excluded only after the trial court determines it is prejudicial to the opposing party."); *State Farm Mut. Auto. Ins. v. Thorne*, 110 So. 3d 66, 71 (Fla. 2d DCA 2013) ("A trial court has discretion to exclude testimony from a witness not disclosed pursuant to a pretrial order. But *Binger v. King Pest Control*, 401 So. 2d 1310, 1314 (Fla. 1981), requires a finding of such prejudice before discretion may be exercised."); *Gaspar's Passage, LLC v. RaceTrac Petroleum, Inc.*, 243 So. 3d 492, 500 (Fla. 2d DCA 2018) ("The trial court also erred when it refused to permit Gaspar to add additional witnesses which were crucial to its defense without

6

conducting a required prejudice analysis."); *Heritage Prop. & Cas. Ins. v. Killmeyer*, 382 So. 3d 708, 712 (Fla. 4th DCA 2024) ("As such, it is incumbent upon the trial court to analyze the *Binger* factors before exercising its discretion to admit or exclude late-disclosed exhibits or witness testimony." (quoting *Montero v. Corzo*, 320 So. 3d 976, 980 (Fla. 3d DCA 2021) (internal alterations omitted))); *Moore v. Gillett*, 96 So. 3d 933, 943 (Fla. 2d DCA 2012) ("Under *Binger*, the test for exclusion of evidence for non-disclosure during pretrial discovery is whether the opposing party was prejudiced in his preparations for trial." (quoting *Gouveia v. Phillips*, 823 So. 2d 215, 222 (Fla. 4th DCA 2002) (internal quotations omitted))).

Second, they have expanded *Binger* from governing undisclosed witnesses to also governing changes in the testimony of disclosed witnesses, including new or changed opinions from an expert witness.[1] *See, e.g.*, *Gurin Gold, LLC v. Dixon*, 277 So. 3d 600, 603 (Fla. 4th DCA 2019) ("The *Binger* rule has been extended from undisclosed witnesses to disclosed witnesses who offer previously undisclosed testimony."); *Killmeyer*, 382 So. 3d at 712 ("Thus, the principles of *Binger* apply not only to the listing of witnesses, but also changes to expert testimony and listing

---

[1] While not at issue in this case, our sister courts have also expanded *Binger* to govern undisclosed and late-disclosed exhibits, in addition to witnesses. *See, e.g.*, *Heritage Prop.*, 382 So. 3d at 712; *Montero*, 320 So. 3d at 980; *Miller v. Conney*, 413 So. 3d 306, 309 (Fla. 1st DCA 2025); *Callari v. Winkeljohn*, 329 So. 3d 795, 797 (Fla. 3d DCA 2021); *Bank of N.Y. Mellon v. Burgiel*, 248 So. 3d 237, 239 n.3 (Fla. 5th DCA 2018).

of exhibits."); *Dep't of HRS v. J.B. By & Through Spivak*, 675 So. 2d 241, 244 (Fla. 4th DCA 1996) ("Although *Binger* dealt with the failure to disclose a witness, its principles have been applied where the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify."); *Drs. Co. v. Plummer*, 210 So. 3d 711, 718 (Fla. 5th DCA 2017) ("The *Binger* analysis has subsequently been applied to cases where an expert changes his or her opinion or gives a new opinion, which results in surprise and prejudice to the opposing party."); *Grau v. Branham*, 626 So. 2d 1059, 1061 (Fla. 4th DCA 1993) ("*Binger* dealt with the failure to disclose a witness, although its teachings have been applied where the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify."); *Moore*, 96 So. 3d at 943 ("The *Binger* analysis should be applied where a medical expert changes his or her opinion, resulting in surprise and prejudice to the opposing party and necessitating a new trial." (quoting *Lewis*, 14 So. 3d at 1234)).

**(c) The detrimental effect of the *Binger* expansion**

Simply put, the combination of these two expansions of *Binger* have made it extremely difficult for trial courts to enforce their pretrial orders in order to effectively manage civil lawsuits and prevent trial by surprise. Under *Binger* as interpreted by our sister courts, anytime a party fails to disclose a witness or a change in a witness's testimony by the deadline set forth in a pretrial order, the trial judge

cannot enforce the pretrial order and exclude the undisclosed testimony without first finding that the opposing party was prejudiced by the failure to disclose. Thus, if an undisclosed witness or undisclosed testimony is offered in the middle of a trial or other evidentiary proceeding, the trial judge must interrupt the proceeding to make a prejudice determination. In such an instance, if the party that did not fail to comply with the pretrial order cannot make an adequate showing of prejudice, potentially in a very short discussion during trial and with little or no notice that the party would have to make that showing (since the non-disclosure is, by definition, a surprise), then the trial judge must allow the undisclosed testimony notwithstanding that the testimony was not disclosed by the deadline set forth in the pretrial order. Surprising a party with new testimony in the middle of trial, and then forcing the surprised party to show prejudice with a very short period of time to argue the issue and no notice that it would be argued, is no way to run a trial and is certainly not consistent with the goals of the discovery rules. Moreover, because the failure to disclose a new witness or new testimony places the opposing party in the difficult position of needing to establish prejudice in a brief argument with little or no notice, this procedure in fact creates a significant incentive for parties not to disclose testimony. While non-disclosure may result in the testimony being excluded, the nature of the requirement for the trial court to find prejudice before excluding the testimony means that the testimony will often ultimately be admitted with the added benefit of

the other party being surprised by the testimony and unable to adequately prepare to counter the testimony – or at least unable to prepare to the same extent the party would have prepared if the testimony had been disclosed by the disclosure deadline in the pretrial order.

Untimely disclosed witnesses or testimony are, in some ways, more disruptive when an untimely disclosure is made not during trial but within the last few days or weeks before the trial. Having sufficient time and the ability to take a deposition of the previously undisclosed witness or concerning the previously undisclosed testimony may, depending on the circumstances, weigh against a finding of prejudice. However, the nature of modern litigation is such that the parties may have been preparing their respective cases for months or years. The new witness or testimony may have affected all of that preparation. While a late deposition may theoretically, sometimes, eliminate the amount of unfair prejudice sufficient to warrant exclusion, the ability to take a deposition in the days before trial is simply not a substitute for a timely disclosure as required by a pretrial order – which may have set the deadline weeks or months earlier. Another very common problem is created if the trial court determines that the only way to ameliorate the prejudice is to allow the party affected by the non-disclosure a continuance – now the party that did not fail to comply with the pretrial order must choose between inadequate time

to prepare to deal with undisclosed testimony or a delay of their trial that, given modern trial dockets, could be months.

There is a reason that trial courts issue pretrial orders with disclosure deadlines – it allows trial courts to manage civil lawsuits to ensure that they are fair, lack surprises, and are completed in a timely manner. *Binger*, as it has been applied by our sister courts, frustrates these important goals by effectively neutering pretrial orders.

### (d) The *Binger* holding

Our sister courts' expansion of *Binger* is exactly that – an expansion of *Binger* beyond its holding. *Binger* did not require either of the above-described expansions. The holding of a case "consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." *Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) (quoting *State v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) (Canady, J., specially concurring)). "Any statement of law in a judicial opinion that is not a holding is dictum." *Pedroza*, 291 So. 3d at 547. Dicta is without force as precedent. *Johnson v. State*, 397 So. 3d 626, 641 n.9 (Fla. 2024) (citing *State ex rel. Biscayne Kennel Club v. Bd. of Bus. Regul. of Dep't of Bus. Regul. of State*, 276 So. 2d 823, 826 (Fla. 1973)). While we are bound to follow all holdings of the Florida Supreme Court, we are not bound by dicta contained in the Supreme Court's

11

opinions. *Regala v. McDonald*, 397 So. 3d 742, 752 (Fla. 6th DCA 2024) (citing *Churchill v. DBI Servs., LLC*, 361 So. 3d 896, 904 (Fla. 1st DCA 2023) ("We are not bound by dicta, only holdings.")).

Applying the framework set forth in *Pedroza*, the Supreme Court's statement in *Binger* – that if the trial court finds that the undisclosed witness will not prejudice the other party after considering the factors listed in *Binger*, then the witness should be allowed to testify – was dictum. The facts of *Binger* were that the trial court allowed the plaintiffs to introduce testimony from a witness that the plaintiffs failed to disclose by the deadline set forth in the pretrial order. The Florida Supreme Court found that the defendant was prejudiced by the testimony of the undisclosed witness. The issue actually decided in *Binger* – based upon its facts – was that the trial court should not have permitted the plaintiffs to introduce the undisclosed witness's testimony where the defendant would suffer prejudice from the undisclosed witness's testimony.

In sum, *Binger* concerned undisclosed witness testimony that was improperly allowed and should have been excluded due to prejudice to the other party. *Binger* did *not* concern undisclosed testimony that was improperly excluded or what the trial court should have considered before excluding undisclosed testimony. Thus, per *Pedroza*, the holding of *Binger* is that where a party fails to disclose a witness by the deadline set forth in a pretrial order, the trial court must consider prejudice to

12

the other party before exercising discretion to *allow* the testimony. The Supreme

Court's statement about what a trial court should consider before *excluding* an

undisclosed witness's testimony was pure dictum. Nothing about this statement led

to the judgment in *Binger* and it is, therefore, not binding on this court or on trial

courts.[2]

Moreover, turning this dictum into a holding ignores other dicta in *Binger*. As

noted above, the Supreme Court stated in *Binger*:

> We have intentionally left room for the operation of local rules and
> customs within the broad parameters of our decision. Local customs
> regarding pretrial disclosure of witnesses vary throughout the circuits
> in Florida, and ***these variations can and should continue. For
> example, in some circuits the pretrial disclosure order not only directs
> that witnesses' names be exchanged, but expressly prevents the
> testimony of any witness not identified within a certain period of time.***
> In other circuits, it is common for the order to exempt by category
> certain types of witnesses from being listed. Another local practice
> requires that counsel for each party demand witnesses' names before a
> court order is entered or in lieu of a court-directed exchange of names.
> ***These local variations in discovery practice within the circuits of
> Florida in no way derogate from our decision***, and we leave their
> interpretation and application, within the stated goals of discovery, to
> the presiding trial judge in each case.

401 So. 2d at 1314 (emphasis added). Thus, the Florida Supreme Court expressly

stated in *Binger* that trial courts can issue pretrial orders that prohibit the introduction

of testimony from undisclosed witnesses, that such orders "in no way derogate from"

---

[2] Judge Gannam's and Judge Pratt's well-reasoned concurrences further explain why the Florida Supreme Court's statement in *Binger* about what a trial court should consider before excluding an undisclosed witness's testimony was dictum.

13

the *Binger* decision, and that these orders, among other local case management practices, "can and should continue." It cannot be the holding of *Binger* that pretrial orders prohibiting the introduction of testimony of undisclosed witnesses cannot be strictly enforced when *Binger* explicitly states that such orders can be enforced.

## II.  The Instant Case

### (a) The proceedings below

On the evening of the incident that gave rise to the proceedings below, Appellant, Michael John Crecelius ("Defendant"), was driving home with his wife in the passenger seat of his SUV when he made a left turn into an intersection and collided with a motorcycle rider, Robert Anthony Alves, Jr. ("Decedent"). Alves died in the collision, and the representative of his estate ("Plaintiff") subsequently sued Defendant for negligence on behalf of the estate. The parties stipulated in the proceedings below that at the time of the crash, Defendant had a blood alcohol level between 0.097 and 0.145 g/100 mL, and Decedent had a blood alcohol level of 0.128 g/100 mL.

On December 29, 2022, the trial court entered a case management order requiring Defendant to disclose his expert witnesses and their opinions by May 1, 2023. Defendant did not serve any expert disclosures by that deadline. On September 19, 2023, after the case was consolidated with a related case against another defendant, the trial court entered an amended case management order that

14

required Defendant to disclose his experts and their opinions by February 10, 2024. By agreement of the parties, this deadline was subsequently extended to March 18, 2024.[3]

On April 10, 2024, Defendant filed his expert witness list, which disclosed the names of two expert witnesses, an accident reconstruction expert named Dr. Martin Garcia, and a human factors expert named Dr. Justin Morgan. The disclosure described each expert's anticipated scope of work, but it did not contain the experts' substantive opinions. On April 25, 2024, Plaintiff served Defendant with two sets of interrogatories and two sets of requests to produce as part of expert witness discovery. On May 15, 2024, Plaintiff filed a motion to strike both defense experts on the ground that the names of the experts were disclosed after the expert disclosure deadline, and the experts' opinions still had not been provided. Defendant filed a response which explained that the expert witness list had been filed late because of internal office mismanagement by Defendant's counsel, and the opinions had not yet been provided because the experts had not given the opinions to Defendant's counsel despite Defendant's counsel's requests for them to do so. Defendant also argued

---

[3] Despite the trial court's amended case management order stating that any changes to the order had to be "approved by the Court," nothing in the record indicates that the parties ever sought the trial court's approval for this extension of Defendant's expert disclosure deadline. However, neither party argued below or on appeal that the agreed upon extension was not valid.

that striking Defendant's experts would prejudice him by preventing him from presenting evidence on his comparative negligence defense.

Defendant finally provided Plaintiff with Dr. Garcia's expert report on May 29, 2024, and Dr. Morgan's expert report on May 31, 2025. Dr. Garcia's report made the following findings: (1) at the time of the accident, Decedent's motorcycle was approaching the subject intersection going above 70 mph in a 50 mph zone; (2) left-turning drivers often do not see approaching motorcycles, which was exacerbated by the nighttime conditions and the motorcycle's excessive speed; (3) the greatest risk of a motorcycle accident is when a motorcycle is approaching an intersection with a left-turning vehicle; and (4) had Decedent been attentive and driving his motorcycle at a reasonable speed, the accident would not have occurred.

Dr. Morgan's report made the following findings: (1) as Defendant began to turn left, Decedent's motorcycle was not in a position where its time of arrival could be appreciated; (2) the average person in Decedent's position would be expected to brake approximately 1.2-1.6 seconds after Defendant began to turn; (3) the speed of Decedent's motorcycle increased the likelihood of drivers not detecting its pending arrival and significantly increased the risk of collision.

On June 3, 2024, fifteen days before the trial was scheduled to begin on June 18, 2024, the trial court held a hearing on Plaintiff's motion to strike Defendant's experts. Plaintiff's counsel argued that since they had only received Dr. Garcia's

16

and Dr. Morgan's opinions on May 29 and 31, respectively, they had insufficient time to prepare rebuttal testimony before trial. This assertion relied in part on Plaintiff's own expert, who told counsel that he could offer a preliminary summary of his rebuttal opinions but could not, from a mathematical and accident reconstruction modeling standpoint, have rebuttal opinions finalized by the time of the trial. Plaintiff argued that, for this reason, allowing Defendant to use his untimely disclosed expert opinions at trial would prejudice Plaintiff.

In response, Defendant's counsel admitted that Defendant's expert disclosures were disclosed late, and that the late disclosure was prejudicial to the Plaintiff. Defendant's counsel attributed the late disclosure of the experts' names to an oversight in their office and asserted that the delay in disclosing the experts' opinions was due to the experts not diligently providing their reports and opinions to Defendant's counsel despite counsel requesting that they do so.[4]

The trial court concluded that Defendant's reasons for the late disclosure did not excuse the untimeliness, and that the circumstances of Defendant's noncompliance with expert disclosure deadlines were egregious. The trial court pointed out that the original expert disclosure deadline was approximately a year earlier in May 2023, and that the deadline had only been extended because the case

---

[4] There is some indication in the record that the experts believed the delay in preparing their opinions was due to lack of proper communication from Defendant's counsel.

was consolidated with a related case. Even under the amended case management order that the trial court entered for the consolidated cases, the deadline to disclose expert opinions was more than three months earlier, in February 2024. The trial court also observed that the case had been pending for more than two years and needed to be resolved. The trial court concluded that Plaintiff would suffer prejudice if Defendant were permitted to call the experts at trial and granted Plaintiff's motion to strike.[5]

The trial began as scheduled on June 18, 2024. Defendant's theory at trial was that Decedent was speeding and that is why Defendant did not have sufficient time to complete his left-hand turn before the parties' vehicles collided. Plaintiff's theory was that Decedent was not speeding, or at most was going a few miles per hour over the speed limit, and that Defendant's poor choice to accelerate his vehicle in the seconds before the crash instead of braking is what caused the crash.

During the trial, Plaintiff presented the testimony of Corporal John Robert Benton of the Florida Highway Patrol, who calculated the speed of Decedent's motorcycle to be 46-58 mph before Decedent began braking. The speed limit in Decedent's lane of traffic was 50 mph. Plaintiff also presented the testimony of

_____

[5] At the beginning of the hearing, the trial court had also indicated that it did not believe granting a continuance was appropriate, noting that the case was over two years old and "the fact that someone may have hired experts that are being difficult and won't give their opinions isn't a basis for continuance of the trial."

18

Roland Hoover, an accident reconstruction expert. He testified, among other things, that: (1) Decedent's speed was 46.3 to 57.3 mph; (2) Decedent operated his motorcycle with more than a reasonable amount of care; and (3) according to his calculations, Decedent noticed Defendant's vehicle and responded by braking within 1.3 seconds, which was 76% faster than most other drivers would have responded. Mr. Hoover further testified that Defendant did not stop before turning left, but rather slowed to 15 mph. He also calculated a gap of 3.8 to 4.07 seconds between the vehicles when Defendant began turning, and he testified that 69% of drivers would not have tried to turn with a gap this small. He believed Defendant had several options, including stopping or rejoining the through lanes of traffic, but continuing the turn was the worst option.

The jury returned a verdict in favor of Plaintiff, finding Defendant to be 100% at fault, and awarding Plaintiff $8.25 million in damages. Defendant filed a motion for new trial which argued, among other things, that the trial court erred by striking Defendant's expert witnesses. The trial court denied the motion, and Defendant timely filed this appeal.[6]

---

[6] Plaintiff filed a notice of cross-appeal. However, Plaintiff's Answer Brief did not include any issues presented in the cross-appeal. Accordingly, the cross-appeal is dismissed. *See* Fla. R. App. P. 9.210(c).

**(b) Analysis**

**i. Defendant's argument**

On appeal, Defendant argues, in keeping with his argument below, that under the test set forth in *Binger* and cases from our sister courts applying *Binger*, the trial court erred in striking Defendant's experts. Specifically, Defendant argues that because Plaintiff received Defendant's expert opinions nearly three weeks before the trial, any prejudice to Plaintiff was not sufficient to warrant exclusion of Defendant's experts and, moreover, the prejudice could have been cured prior to trial or with a brief continuance. Defendant argues that in comparison to the minimal and curable prejudice to Plaintiff from Defendant's late disclosure, Defendant suffered extreme prejudice as a result of the trial court striking his only two experts, which left Plaintiff's experts essentially uncontradicted. Defendant argues that given this balance of prejudice and the lack of any bad faith by Defendant, the trial court abused its discretion by striking Defendant's experts.

**ii. Authority governing exclusion of late-disclosed expert opinions**

As noted above, *Binger*'s holding concerns what a trial judge must consider before allowing an undisclosed witness; it does not concern what a trial judge must consider, if anything, before excluding a late-disclosed witness or a late-disclosed opinion from an expert witness. In the absence of a binding holding from the Florida Supreme Court, we decide this issue from first principles. *See CED Cap. Holdings*

20

*2000 EB, LLC v. CTCW-Berkshire Club, LLC*, 363 So. 3d 192, 195 (Fla. 6th DCA 2023).

Simply put, the rules promulgated by the Florida Supreme Court give trial judges the power and duty to set and enforce deadlines, including deadlines concerning disclosure of expert witnesses and expert opinions. The version of Florida Rule of Civil Procedure 1.200 in effect at the time of the proceedings below stated that at a case management conference, "the court may . . . schedule disclosure of expert witnesses and the discovery of facts known and opinions held by such experts." Fla. R. Civ. P. 1.200(a)(8) (2024). The power to set a deadline to disclose expert witnesses and opinions includes the power to enforce the deadline – otherwise the power is meaningless and there is really no deadline at all.

Further, Rule 2.545(a) of the Florida Rules of General Practice and Judicial Administration states that "[j]udges . . . have a professional obligation to conclude litigation as soon as it is reasonably and justly possible to do so." To that end, Rule 2.545(b) mandates that "[t]he trial judge shall take charge of all cases at an early stage in the litigation and shall control the progress of the case thereafter until the case is determined." The duty to "take charge" of a case and "control the progress of the case" in order to conclude the case as soon as it is reasonably and justly possible to do includes the power to set and enforce case management deadlines that serve precisely to accomplish that end.

21

After the proceedings below concluded, the Florida Supreme Court amended Florida Rule of Civil Procedure 1.200 to make a trial judge's authority to enforce case management deadlines even more explicit. The new version of Rule 1.200, which became effective January 1, 2025, continues to grant trial courts explicit authority and in fact now imposes an affirmative duty on trial courts to enter a case management order which specifies a deadline for "completion of expert discovery." Fla. R. Civ. P. 1.200(d)(2)(E) (2025). The rule now also provides that "[t]he case management order *must* indicate that the deadlines established in the order will be *strictly enforced* unless changed by court order." Fla. R. Civ. P. 1.200(d)(3) (2025) (emphasis added). Subsection (e)(1) reiterates this requirement, again stating that "[d]eadlines in a case management order must be *strictly enforced* unless changed by court order." Fla. R. Civ. P. 1.200(e)(1) (2025) (emphasis added). While the new version of Rule 1.200 was not in effect at the time of the proceedings below, it speaks to a trial court's authority to set and enforce case management deadlines that was already embodied in Rule 1.200.[7]

---

[7] The amendment to Rule 1.200 certainly also supports this opinion's analysis of *Binger* as it might apply after the amendment, as the rule's mandate for trial courts to strictly enforce case management deadlines is incompatible with our sister courts' holdings that *Binger* requires a prejudice determination before a trial court can actually enforce a case management order and exclude a witness or testimony that was not disclosed as required by the case management order. Our sister courts' interpretation of *Binger* cannot survive the Florida Supreme Court's mandate that case management orders be "strictly enforced." Additionally, an amendment to Florida Rule of Civil Procedure 1.380 that also took effect on January 1, 2025, sets

### iii. The trial court was permitted to strictly enforce the case management order and exclude Defendant's experts.

The case management order at issue in this case was exactly the type of order contemplated by Rule 1.200. The amended case management order entered by the trial court set a deadline of February 10, 2024, for Defendant to disclose all of his experts and their opinions to Plaintiff. Because trial courts have authority to set and enforce case management orders, when Defendant failed to disclose his experts' names, much less their opinions, by the required deadline, the trial court was permitted to strictly enforce the case management order and exclude the experts, without considering whether Plaintiff would have been prejudiced by the introduction of the late-disclosed opinions. Accordingly, the trial court did not err by granting Plaintiff's motion to strike Defendant's experts and excluding the experts from testifying.[8]

---

a new standard that is different than our sister courts' interpretation of *Binger* for excluding certain specific categories of undisclosed witnesses and evidence. Under Rule 1.380(d), as amended, "[i]f a party fails to provide information or identify a witness as required by rule 1.280(a) or (g), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Thus, for undisclosed witnesses or evidence falling within the scope of Rule 1.380(d), a trial court now *must* exclude the evidence unless the failure to disclose was "substantially justified or . . . harmless." This is a significantly different standard than determining whether the other party would suffer prejudice under *Binger*. In this additional respect, our sister courts' interpretation of *Binger* is incompatible with the Florida Supreme Court's recent amendments to the Florida Rules of Civil Procedure.

[8] While neither lack of prejudice to Plaintiff from admitting the late-disclosed opinions, nor prejudice to Defendant from excluding the opinions, required the trial

## III. Conclusion

The Florida Rules of Civil Procedure allow trial courts to set and enforce case management deadlines, including deadlines for the disclosure of expert witnesses and their opinions. Where a party fails to meet a disclosure deadline set forth in a case management order, the trial court may strictly enforce the order and exclude the undisclosed or late-disclosed evidence. Because Defendant did not disclose his experts and their opinions by the deadline set forth in the case management order, the trial court did not err by enforcing its order and excluding the experts' testimony.

While our sister courts have held that *Binger* requires a trial court to find that the opposing party would be prejudiced by the introduction of an undisclosed or late-

---

court to admit Defendant's late-disclosed expert opinions, the version of Florida Rule of Civil Procedure 1.200 in effect at the time of the proceedings below did provide that a trial court's case management order "controls the subsequent course of the action *unless modified to prevent injustice*." Fla. R. Civ. P. 1.200(d) (2024) (emphasis added). Thus, in cases governed by that prior version of the rule, where a trial court denied a request to modify a case management order, the party that sought the modification could argue that the trial court erred by denying the modification because the modification was necessary to prevent injustice. However, in this case, while Defendant sought to admit the late-disclosed opinions of his experts despite missing the expert disclosure deadline, Defendant never requested an extension of the expert disclosure deadline beyond the initial extension to which the parties agreed. Thus, subsection (d) of the prior version of Rule 1.200 is not at issue in this case. Even if Defendant had sought a modification of the case management order, nothing in the record indicates that a modification of the case management order was necessary to prevent injustice. The current version of Rule 1.200, which became effective January 1, 2025, removes the reference to "prevent injustice" and simply provides that "[d]eadlines in a case management order must be strictly enforced unless changed by court order." Fla. R. Civ. P. 1.200(e)(1).

24

disclosed expert opinion before excluding the opinion, we find that *Binger* imposes no such requirement for the reasons stated above. We decline to adopt such a requirement because to do so would be inconsistent with the Florida Rules of Civil Procedure. Pursuant to Article V, Section 3(b)(4) of the Florida Constitution, we certify this decision to be in direct conflict with the following decisions of our sister courts holding that *Binger* requires a trial court to find that the opposing party would be prejudiced by the introduction of testimony of an undisclosed or late-disclosed witness, or by the introduction of a late-disclosed expert opinion, before excluding the witness's testimony:

1. *Callari v. Winkeljohn*, 329 So. 3d 795 (Fla. 3d DCA 2021)

2. *Gaspar's Passage, LLC v. RaceTrac Petroleum, Inc.*, 243 So. 3d 492 (Fla. 2d DCA 2018)

3. *Bank of N.Y. Mellon v. Pearson*, 212 So. 3d 1071 (Fla. 3d DCA 2017)

4. *Deutsche Bank Nat'l Tr. Co. ex rel. LSF MRA Pass-Through Tr. v. Perez*, 180 So. 3d 1186 (Fla. 3d DCA 2015)

5. *State Farm Mut. Auto. Ins. Co. v. Thorne*, 110 So. 3d 66 (Fla. 2d DCA 2013)

6. *Harrell v. Aztec Env't, Inc.*, 921 So. 2d 805 (Fla. 1st DCA 2006)

7. *Dos Santos v. Carlson*, 806 So. 2d 539 (Fla. 3d DCA 2002)

8. *Berlin v. Roldan*, 786 So. 2d 649 (Fla. 4th DCA 2001)

9. *Westerly v. King*, 782 So. 2d 997 (Fla. 1st DCA 2001)

10. *Cedar Hammock Fire Dep't v. Bonami*, 672 So. 2d 892 (Fla. 1st DCA 1996)

11.  *Walters v. Keebler Co.*, 652 So. 2d 976 (Fla. 1st DCA 1995)

12.  *Pimentel v. Alamo*, 555 So. 2d 895 (Fla. 3d DCA 1990)

13.  *Lugo v. Fla. E. Coast Ry. Co.*, 487 So. 2d 321 (Fla. 3d DCA 1986)

14.  *Haines v. Haines*, 417 So. 2d 819 (Fla. 4th DCA 1982)

15.  *Gray Truck Line Co. v. Robbins*, 476 So. 2d 1378 (Fla. 1st DCA 1985)

16.  *Melrose Nursery, Inc. v. Hunt*, 443 So. 2d 441 (Fla. 3d DCA 1984)

DISMISSED in part; AFFIRMED in part; CONFLICT CERTIFIED.

TRAVER, C.J., and STARGEL, NARDELLA, BROWNLEE, and KAMOUTSAS, JJ., concur.
WOZNIAK, J., concurs and concurs specially, with opinion, in which STARGEL, J., concurs.
GANNAM, J., concurs and concurs specially, with opinion.
PRATT, J., concurs and concurs specially, with opinion, in which STARGEL, J., concurs.
SMITH, J., concurs in result only, with opinion.
WHITE, J., concurs in result only, without opinion.

_____

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED
_____

WOZNIAK, J., specially concurring.

I concur in the majority opinion, however I write separately to address section I(d). I agree with the analysis in that section insofar as it acknowledges that our sister courts have expanded *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981), beyond what the Florida Supreme Court originally intended. However, I would end the discussion there and call for a reexamination of *Binger*.

26

In my view, there is tension both inherent in *Binger* (its call for the application of a prejudice consideration, albeit under limited circumstances, as compared with its reassurance that local rules and customs are to be given weight) and extant with the amendments to Florida Rules of Civil Procedure 1.200(d)(3) and 1.200(e)(1) that became effective on January 1, 2025.[9] On this latter point, I agree with Judge Gooden's concurrence in *Marine Design Dynamics, Inc. v. All City Construction Services, LLC*, 50 Fla. L. Weekly D2653 (Fla. 3d DCA Dec. 17, 2025), that the Florida Supreme Court's recent rule amendments intended to streamline litigation[10] are incompatible with *Binger*. *Id.* at D2656 (Gooden, J., concurring specially) ("The core tension is self-evident: A judge cannot simultaneously 'strictly enforce' the discovery deadline, as the Rules now demand, while also applying a prejudice analysis, that functionally excuses the violation of that very deadline." (citing *Binger*, 401 So. 2d at 1313-14)).

STARGEL, J., concurs.

---

[9] Rule 1.200(d)(3) addresses the strict enforcement of deadlines: "The case management order must indicate that the deadlines established in the order will be strictly enforced unless changed by court order." Rule 1.200(e)(1) provides that "[d]eadlines in a case management order must be strictly enforced unless changed by court order."

[10] *In re: Amends. to Fla. Rules of Civ. Proc.*, 402 So. 3d 925 (Fla. 2024), *as corrected* (Jan. 23, 2025); *In re: Amends. to Fla. Rules of Civ. Proc.*, 386 So. 3d 497 (Fla. 2024).

GANNAM, J., specially concurring.

I fully concur in the majority opinion. I write separately to explain how the Florida Supreme Court's definitional test for holding and dicta in *Pedroza v. State*, 291 So. 3d 541 (Fla. 2020), changes how we distinguish holding from dicta and to highlight its application to our interpretation of *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981), in this case.

I

A

Florida's earliest supreme court opinions generally identified propositions as dicta when the propositions were unrelated to case facts or issues presented. *See, e.g.*, *Ponder v. Moseley*, 2 Fla. 207, 272 (1848) ("The character of the execution was not discussed, no authorities on the point were referred to by counsel, or the court; with very great respect for Chief Justice Taney, I incline to think his decision of that point may be regarded as rather an *obiter dictum*."); *City of Apalachicola v. Apalachicola Land Co.*, 9 Fla. 340, 354 (1861) ("That portion of the opinion of the court which is not directly in analogy with the acts of the case under consideration, can only be looked upon as extra judicial dicta.").

The court first suggested a necessity approach for identifying dicta in *Hart v. Stribling*, 6 So. 455 (Fla. 1889). Having to discern what it held in a prior decision in the same case, the *Hart* court concluded, "[T]he court did not, and could not, decide

the case upon its merits, because the merits [of] the cause were not then before the court." *Id.* at 456. Thus, the court continued, "The only reasonable conclusion that can be arrived at . . . is that the opinion there expressed upon the merits of the cause was the mere *dictum* of the justice rendering the decision. The *dictum* of a judge is not the decision of a court." *Id.* The court then quoted a necessity principle for identifying dicta: "There is nothing authoritative in a case, except what is required to be decided to reach the final judgment . . . ." *Id.* (quoting *Love v. Miller*, 53 Ind. 294, 299 (1876)). In 1903, the court first expressly identified dicta as a proposition "not necessary" to a decision. *See Hillsborough Cnty. v. Henderson*, 33 So. 997, 999 (Fla. 1903) ("[I]t was therefore not necessary to the determination of the case that they should decide whether gold bonds could be issued, but, as a dictum, the court intimates that the power existed.").

The 1910 second edition of *Black's Law Dictionary* added a citation to *Hart* in support of its definition of dicta, which carried over from its 1891 first edition: "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination . . . ." *Dictum*, *Black's Law Dictionary* 366 (2d ed. 1910); *Dictum*, *Black's Law Dictionary* 365 (1891). In the 1929 case *Pell v. State*, the Florida Supreme Court, similarly to *Black's*, identified dicta by its lack of essentiality to a

29

decision. 122 So. 110 (Fla. 1929). Referring to a "suggestion" in a prior case that "was more or less apposite to the point being discussed," the court concluded "it was not essential to the decision in that case, and hence mere obiter dictum and without force as a precedent." *Id.* at 112.

In the nine decades between *Pell* and *Pedroza*, the supreme court interchangeably used necessity and essentiality as its test for dicta. *See, e.g., Therrell v. Reilly*, 151 So. 305, 306 (Fla. 1932) ("What was said in that case was not mere obiter dicta, because it was necessary for us to say what we did in order to dispose of the petition . . . ."); *Harris v. Baden*, 17 So. 2d 608, 610 (Fla. 1944) ("[I]t will be apparent that the language of the decisions upon which counsel relies, as addressed to the point at hand, was dicta upon a collateral subject and not essential to the question then pending."); *Doyle v. City of Coral Gables*, 33 So. 2d 41, 41 (Fla. 1947) ("[W]hat was said on that point was purely obiter and unnecessary to decision of the main question in the case."); *State v. Fla. State Improvement Comm'n*, 60 So. 2d 747, 750 (Fla. 1952) ("The language above quoted was not essential to a decision in that case and is obiter dicta."); *Seaboard Air Line R. Co. v. Gay*, 68 So. 2d 591, 593 (Fla. 1953) ("Such language was unnecessary to a decision in that case and may be considered as dictum."); *Pinkerton-Hays Lumber Co. v. Pope*, 127 So. 2d 441, 443 (Fla. 1961) ("We are of the view that the portion of the . . . opinion which we have quoted and which has met with our disapprobation was not essential to the result at

30

which the court ultimately arrived. It is purely and simply obiter dictum.");

*Withlacoochee River Elec. Co-op., Inc. v. Tampa Elec. Co.*, 158 So. 2d 136, 137 (Fla. 1963) ("[T]he remarks contained in said footnote were unnecessary to the decision which we reached . . . and constitute nothing more nor less than obiter dicta."); *State ex rel. Biscayne Kennel Club v. Bd. of Bus. Regul.*, 276 So. 2d 823, 826 (Fla. 1973) ("The statement of the District Court of Appeal in its opinion . . . was not essential to the decision of that court and is without force as precedent."); *State v. Ferrari*, 398 So. 2d 804, 807 (Fla. 1981) ("By the court's admission this reasoning was not necessary to the decision and therefore was dicta."); *Van Tassel v. Coffman*, 486 So. 2d 528, 529 (Fla. 1986) ("The quoted statement was not essential to that holding and was dicta."); *Puryear v. State*, 810 So. 2d 901, 904 (Fla. 2002) ("This Court's discussion in *Power* concerning section 90.801(2)(c), however, was not essential to the holding in *Power*. . . . Thus, the . . . discussion was not necessary and constituted dicta.").[11]

---

[11] Given the court's regular oscillation between "necessary" and "essential" during this period, and the significant overlap of their definitions at both ends of the period, I assume the court used the terms synonymously. *Compare Necessary*, *Universal Dictionary of the English Language* 3263 (1899) (def. 3, "Indispensably requisite or needful; essential; such as cannot be done without or dispensed with."), *and Necessary*, 7 *Oxford English Dictionary* 60 (1933) (def. A.I.1.a, "Indispensable, requisite, essential, needful; that cannot be done without."), *and Necessary*, *Webster's New International Dictionary* 1635 (2d ed. 1934) (def. 1, "Essential to a desirable or projected end or condition . . . ."), *and Necessary*, *Merriam-Webster's Collegiate Dictionary* 828 (11th ed. 2020) (def. 1, "absolutely needed"), *and Necessary*, *American Heritage Dictionary of the English Language* (5th ed. 2022),

B

In *Pedroza*, the supreme court reformed the dicta analysis. The court defined dicta as "[a]ny statement of law in a judicial opinion that is not a holding," and then defined holding: "A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." 291 So. 3d at 547 (quoting *State v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) (Canady, J., specially concurring) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005))). Setting aside the prior necessity test, the court adopted its new, refined definitional test from a 2005 Stanford Law Review article, verbatim:

---

https://perma.cc/8BMY-XCSG (def. 1, "Needed or required . . . ."), *and Necessary*, *Oxford English Dictionary* (3d ed. Dec. 2025), https://doi.org/10.1093/OED/ 8623364186 (adj. def. I.1.a, "Indispensable, vital, essential; requisite."), *with Essential*, *Universal Dictionary of the English Language* 1937 (1899) (def. 1, "Necessary to the essence, constitution, or existence of anything . . . .") (def. 3, "Important in the highest degree."), *and Essential*, 3 *Oxford English Dictionary* 296 (1933) (def. 3.b, "Affecting the essence of anything; 'material', important") (def. 4.a, "Absolutely necessary, indispensably requisite"), *and Essential*, *Webster's New International Dictionary* 874 (2d ed. 1934) (def. 3, "Important in the highest degree; indispensable."), *and Essential*, *Merriam-Webster's Collegiate Dictionary* 427 (11th ed. 2020) (def. 2a, "of the utmost importance"), *and Essential*, *American Heritage Dictionary of the English Language* (5th ed. 2022), https://perma.cc/M7GN-P6YM (def. 2, "Fundamentally important or necessary . . . ."); *and Essential*, *Oxford English Dictionary* (3d ed. Dec. 2025), https://doi.org/10.1093/OED/1717600687) (def. 3.b, "Affecting the essence of anything; 'material', important") (def. 4.a, "Absolutely necessary, indispensably requisite").

32

Having now considered several definitions of holding and dicta, we will set out our own. This definition seeks to capture in an easily applied manner the resolutions of the problem categories that we have suggested above. A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta.

Abramowicz & Stearns, *supra*, at 1065 (footnote omitted). With over 140 pages of analysis and commentary, the authors carefully worked through easy categories, such as propositions necessary to a judgment (presumptively holding), and "problem categories" (potentially holding or dicta), such as alternative justifications (e.g., two independent grounds for a decision), structured or ordered tests (e.g., strict scrutiny, qualified immunity, etc.), and hypotheticals. *See* Abramowicz & Stearns, *supra*, at 1025–43. They also explained considerations that could move certain propositions from presumptive holding to dicta, and vice versa. *Id.* The result was, in the authors' view, a definition of holding that "allows a judge to draw one or more conceptual lines (or paths) from case facts to judgment, and to credit all issues resolved along the chosen path or paths to produce holdings," and that "discounts as dicta issues on paths that do not originate in the facts in the case or that lead nowhere." *Id.* at 1066. Thus, "[e]ach of the three numbered prongs is premised upon the power of the deciding jurist or court to select among one or more potential decisional paths in resolving a case." *Id.* at 1065. The authors cautioned, however, that their "definition

33

is easy to articulate," but "each element proves more complex than it might first appear." *Id.* at 1067.

The Abramowicz–Stearns definitional approach is intentionally innovative, as the authors extensively reviewed prior scholarship and concluded that "no satisfactory definition has yet to emerge." Abramowicz & Stearns, *supra*, at 958; *see also id.* at 959 ("[T]he most commonplace—and frequently cited—definitions of these terms are problematic in profound ways. Appreciating both the questions of why these definitions emerged and what is problematic about them is essential to our project."); *id.* at 960 ("The approach that we offer proves essential . . . in exposing nuances that more impressionistic methodologies have failed to identify."). The authors hoped judges would adopt their new definition, commending, "[O]ur definition captures the essential intuitions necessary for a theoretically satisfying and functional understanding of holding and dicta, one that we believe has the potential to benefit the process of judicial decisionmaking," and promising, "If judges were uniformly to adopt our definition and our proposed resolution of particular problems, courts would apply the holding-dicta distinction more consistently and in a manner more faithful to the underlying function of the distinction." *Id.* at 1093–94.[12]

---

[12] So far, Florida's is the only state high court to wholly adopt the Abramowicz–Stearns definitional test.

While we should not assume the *Pedroza* court endorsed all of the Abramowicz–Stearns article, we can assume the court's *verbatim* adoption of the authors' new definitional test indicates some persuasion by the authors' case for its need and incorporates some substantial part of their work in making the case. At a minimum, we should assume *Pedroza*'s adoption of the definitional test incorporates what the authors said about identifying holding and dicta by a proposition's necessity: "as a *core element* in the definition of holding, necessity is itself not necessary." *Id.* at 959 (emphasis added). Like the pre-*Pedroza* Florida Supreme Court decisions that usually identify dicta by reference to a proposition's lack of necessity to a judgment (*see supra* Part I.A.), *Black's Law Dictionary*, both at the time of the article and now, puts necessity at the center of its definition of dicta: "A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." *Obiter dictum*, *Black's Law Dictionary* 1102 (8th ed. 2004) (12th ed. 2024). Abramowicz and Stearns deemed this definition "[t]he most influential" but also "the easiest to falsify," concluding, "we should not be surprised that it is inconsistent with standard judicial practices, including that of according precedential status to alternative justifications." Abramowicz & Stearns, *supra*, at 1056. On this point, they deemed the definition "indefensible" because "it cannot be the case that an opinion that strikes down a law on two grounds rather than one expresses no holding," even

35

though the court's resolution on either ground is made unnecessary by its resolution on the other. *Id.* at 959 & n.15.[13]

Abramowicz and Stearns also rejected the necessity definition because "[a]ny time a case could be resolved on narrower grounds, the broader rationale can be claimed unnecessary." *Id.* at 1058. Thus, they argued, the mere availability of any narrower ground "would potentially prevent the broader articulated ground from having precedential status." *Id.* at 1060. Any suggestion of a narrower ground in an opinion concurring in the judgment, or even a law review article, could "prove a sufficient . . . condition for disregarding the broader rationale embraced in a majority opinion." *Id.* They "conclude[] as a normative matter that judges should be allowed

---

[13] In a 1931 case, the Florida Supreme Court implicitly excepted alternative holdings from the necessity requirement, though the exception is rarely cited:

> A ruling in a case fully considered and decided by an appellate court is not dictum merely because it was not necessary, on account of one conclusion reached upon one question, to consider another question the decision of which would have controlled the judgment.
>
> Two or more questions properly arising in a case under the pleadings and proof may be determined, even though either one would dispose of the entire case upon its merits, and neither holding is a dictum, so long as it is properly raised, considered, and determined.

*Parsons v. Fed. Realty Corp.*, 143 So. 912, 920 (Fla. 1931).

to create holdings broader than necessary" and "that judges are, in fact, allowed to do so in practice." *Id.* at 1058.

On the other hand, necessity is still *relevant* under the Abramowicz–Stearns approach because "any proposition that *is* necessary to . . . either the disposition or for another holding will itself be a presumptive holding." Abramowicz & Stearns, *supra*, at 973 (emphasis added). Only presumptively, however, because propositions seemingly necessary to a judgment but not actually decided are not holdings. *Id.* at 1071–72. "A common form of this is for a court to assume arguendo that a particular proposition holds and then resolve the case on that basis." *Id.* at 1072.

To summarize the Abramowicz–Stearns treatment of necessity, which is baked into the new definitional test *Pedroza* adopted verbatim from their article, a proposition that is not necessary to a judgment is not automatically dicta, and a proposition that is necessary to a judgment is not automatically holding—a necessary proposition is only presumptively holding. In either case, the full definitional test must be applied to determine what is holding. This means the *Pedroza* definitional test for holding and dicta is incompatible with the century of prior Florida caselaw treating necessity as the bright line dividing them. Post-*Pedroza*, necessity is no longer viable as a shorthand test for propositions that count as holding.

## C

*Pedroza*'s definitional test for holding *is* holding because it meets its own criteria. The *Pedroza* court granted review to decide two questions regarding a forty-year prison sentence for a homicide offense committed by a juvenile—whether the sentence violated the Eighth Amendment and whether it violated Florida law under three prior Florida Supreme Court opinions: *Henry v. State*, 175 So. 3d 675 (Fla. 2015), *Kelsey v. State*, 206 So. 3d 5 (Fla. 2016), and *Johnson v. State*, 215 So. 3d 1237 (Fla. 2017). *See Pedroza*, 291 So. 3d at 544–45. To answer the second question, the *Pedroza* court reviewed *Henry*, *Kelsey*, and *Johnson* to determine what they held. *Id.* at 546–49. And to determine what those cases held, the court announced and applied its new, three-part definitional test for holding. *Id.* at 547. Applying the test to its prior *Kelsey* opinion, the court determined *Kelsey*'s holding was narrower than its interpretation by some district courts. *Id.* at 546–48. Applying the test to *Johnson*, however, the court determined that *Johnson*'s holding—a new, three-part juvenile sentencing test—was in error. *Id.* at 548. The court receded from the erroneous *Johnson* test and ultimately concluded the sentence on review did not violate the Eighth Amendment or Florida law. *Id.* at 549.

*Pedroza*'s new definitional test for holding is part of the opinion's holding because it was actually decided on the court's chosen decisional path of reasoning, leading from the case facts to the judgment. *See* 291 So. 3d at 547. As a holding, the

38

test replaces the court's prior necessity approach, and at least two aspects of the opinion show the replacement was intentional. First, in distinguishing *Kelsey*'s holding from its dicta, the *Pedroza* court identified the propositions "not necessary" to the *Kelsey* decision *and kept going.* 291 So. 3d at 547. Instead of stopping at necessity, the court completed its holding analysis of *Kelsey* by considering the "decisional path of reasoning" element of its new test. *Id.* at 547–48. Second, the *Pedroza* court identified as holding the new, three-part juvenile sentencing test announced in *Johnson* even though the *Johnson* test was "clearly . . . a rule of law much broader than the facts required." *Id.* at 548. For both the *Kelsey* and *Johnson* propositions at issue, the *Pedroza* court did not pin its holding or dicta determinations on the necessity of the propositions to their respective decisions. Thus, the *Pedroza* court adhered to the Abramowicz–Stearns definitional approach to identifying holding, which rejects necessity as necessary and, when a court chooses a decisional path to judgment that announces (i.e., actually decides) a test and applies it to case facts, treats both the test and its application as holding. *See* Abramowicz & Stearns, *supra* at 959, 984–85, 1039–40, 1055–61, 1077–78.[14]

Despite enshrining the definitional test in its *Pedroza* holding, the supreme court did not cite *Pedroza* when it answered a holding-or-dicta question in *Tsuji v.*

_____

[14] Stating existing law as a precedential test to be applied in future cases is within the judicial power "to say what the law is," "expound and interpret it," and "apply the rule to particular cases." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

*Fleet*, 366 So. 3d 1020 (Fla. 2023). After taking many steps down its decisional path, the *Tsuji* court considered the precedential effect of statements in a prior case, and concluded, "Our statements . . . supporting the result reached [in the prior case] were not essential to our holding. So these statements are 'without force as precedent' . . . ." 366 So. 3d at 1031. To the extent the *Tsuji* court meant the prior statements were not holding because they were not necessary to the judgment in the prior case, it would be difficult to reconcile the court's callback to the old necessity test with the *Pedroza* definitional test. But if, by "not essential to our holding," the *Tsuji* court meant not an essential step on the chosen decisional path leading to the judgment, then *Tsuji* may be consistent with *Pedroza*. *See* Abramowicz & Stearns, *supra*, at 1072 (treating proposition as holding when it forms "an essential step on the selected path" and is actually decided). Either way, however, the supreme court "does not intentionally overrule itself sub silentio." *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002); *see also Roberts v. Brown*, 43 So. 3d 673, 683 (Fla. 2010) ("Notably, our decision in *Lane* was issued . . . only two years after we proclaimed our original and exclusive jurisdiction over these matters. Had we intended to overrule our prior declaration of exclusive jurisdiction, we would have done so in a more definite and express manner . . . ." (citation omitted)). There is no express holding in *Tsuji*

overruling, limiting, or receding from *Pedroza*'s definitional test. Thus, we should treat *Pedroza* as binding unless the supreme court says otherwise.[15]

*Pedroza* binds us to its definitional test for holding and dicta, so we should employ it fully when distinguishing between holding and dicta in prior opinions. To be sure, it requires more of us than the prior necessity test. Now, instead of determining only whether a proposition was necessary to the prior decision, we should determine whether it was actually decided on the court's chosen decisional path leading from the case facts to the judgment. We need not disregard necessity, but if we determine a given proposition was necessary to the prior decision, we must still determine whether the proposition was actually decided in the case. And if we

---

[15] The supreme court also alluded to the necessity test for dicta, post-*Pedroza*, in *Davis v. State*, 332 So. 3d 970, 975 (Fla. 2021), but did not rely on it, viewing the "broad, unqualified" proposition at issue to be not only unnecessary to its prior decision, but also "far beyond the facts." Thus, the proposition would not have satisfied the *Pedroza* holding requirement that a proposition be "based upon the facts of the case." 291 So. 3d at 547. Our Court has also called back to the necessity test in two cases since *Pedroza*, but neither conflicts with *Pedroza*'s holding. In one, *Mannella v. Mannella*, 363 So. 3d 236, 240–41 (Fla. 6th DCA 2023), we did not rely on the necessity test exclusively, viewing the proposition at issue to be not only unnecessary to a prior supreme court decision, but also to have "no bearing on its decision." Thus, the proposition would not have satisfied the *Pedroza* holding requirement that a proposition lie "along the chosen decisional path . . . of reasoning that . . . lead to the judgment." 291 So. 3d at 547. In the other, *Regala v. McDonald*, 397 So. 3d 742, 752 (Fla. 6th DCA 2024), we identified as dicta a proposition "not necessary to" a supreme court decision, but also quoted the *Pedroza* definitional test in support of the identification. To the extent *Mannella* and *Regala* muddy the waters in this district, the en banc majority opinion in this case clarifies that the *Pedroza* definitional test is binding.

determine the proposition was not necessary to the prior decision because the court *could* have ruled more narrowly or *also* ruled on a separate question that would have disposed of the case by itself, we must still determine whether the proposition was nonetheless decided on the court's *chosen* decisional path from facts to judgment. If we determine the proposition is dicta, we should say which part of the definitional test it did not meet. Consistently applying the *Pedroza* definitional test will promote development of precedent on the test itself and clarity in the application of both vertical and horizontal stare decisis in future decisions.

II

Having explained what *Pedroza* requires of us, I turn to *Binger*'s holding and its application to the present case. Although a court's announcement of a new test can be a binding holding, along with the court's application of the test (*see supra* Part I.C), the majority correctly concludes the test announced in *Binger* does not bind a trial court to consider prejudice to the objecting party (or the noncompliant party) before *excluding* undisclosed witness testimony, even if *Binger* does require a trial court to consider prejudice to the objecting party before *allowing* undisclosed witness testimony.

In *Binger*, the supreme court affirmed a Fourth District decision granting the defendant a new trial after the trial court allowed trial testimony by the plaintiffs' undisclosed impeachment witness. 401 So. 2d at 1314–15. The supreme court's

42

judgment was based on its conclusions that the plaintiffs should have disclosed the impeachment witness on their pretrial witness list and that the defendant was prejudiced by the trial court's allowance of the undisclosed witness's testimony. *Id.* The court reached its conclusions by applying two "rules" that it had developed in the course of its opinion. *Id.* at 1314. The first rule the *Binger* court announced was that "a pretrial order directing the parties to exchange the names of witnesses requires a listing or notification of all witnesses that the parties reasonably foresee will be called to testify, whether for substantive, corroborative, impeachment or rebuttal purposes." *Id.* at 1313. The second rule proceeds from the first: "It follows, of course, that a trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly . . . ." *Id.* The court appended to the "must" of the discretionary exclusion rule some "should[s]" and a "may" regarding consideration of prejudice to the objecting party. *Id.*

The majority correctly reads *Binger*'s rule for excluding undisclosed witnesses to begin and end with trial court discretion. *See id.* at 1312 ("[W]e essentially approve . . . leav[ing] ultimate control over witness disclosure problems to the broad discretion of the trial judge . . . focus[ing] on prejudice in the preparation and trial of a lawsuit."); *id.* at 1313 ("That approach places all problems regarding the testimony of undisclosed witnesses within the broad discretion of the trial judge.

43

It thus vests in the trial judge the interpretation and enforcement of any pretrial order mandating witness disclosure, and limits reviewing courts to reversals only in cases of a clear showing of abuse prejudicial to the affected party."); *id.* at 1314 ("Requiring reasonable compliance with a pretrial order directing witnesses' disclosure will help to eliminate surprise and avoid trial by 'ambush.'"). The prejudice "should[s]" and "may" appended to the "must" rule of discretion were self-consciously rules of "reasonable guidance," *id.* at 1312, not obligation, especially considering the court's several examples of "discovery practice within the circuits" that "in no way derogate from our decision," including pretrial orders that "expressly prevent[] the testimony of any witness not identified within a certain period of time." *Id.* at 1314. The court left "interpretation and application" of such orders "to the presiding trial judge in each case," provided such discretion is "not . . . exercised blindly"—i.e., outside "the stated goals of discovery." *Id.* at 1314. Thus, under *Pedroza*, *Binger*'s discretion-to-exclude rule was actually decided and is holding, and *Binger*'s "reasonable guidance" regarding consideration of prejudice was only actually decided as to the case facts—i.e., requiring a trial court to consider prejudice before *allowing* undisclosed witness testimony. Beyond the *Binger* case facts, its guidance regarding consideration of prejudice is dicta.[16]

---

[16] Even under the prior necessity test, the Florida Supreme Court recognized that tests announced by the court do not always apply in future cases involving

materially different facts, including where the difference is between a trial court's allowance and disallowance of a party's request:

> To recite and approve a general rule in one case is not the equivalent of establishing it as an unyielding, inflexible guide in every case. . . . We have held that an opinion emanating from this Court must be construed in the light of the facts and circumstances of the case which was then before us for decision. . . . The effect of our ruling was an affirmance of the Circuit Judge who *disallowed* expert witnesses' fees. In the present case the Circuit Judge *allowed* expert witnesses' fees and included them in the judgment.

*Dade Cnty. v. Brigham*, 47 So. 2d 602, 603 (Fla. 1950).

_____

PRATT, J., specially concurring.

I fully concur in the majority's opinion. I write separately to make three observations.

First, judges are constrained to decide the cases before them. The judicial power is not a "roving commission." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). It is a limited grant of authority that permits the judiciary to decide actual cases and controversies. *See, e.g.*, *Casiano v. State*, 310 So. 3d 910, 913 (Fla. 2021) ("Article V, section 1 of the Florida Constitution vests '[t]he judicial power' in Florida's courts, and Florida's courts, including its appellate courts, reserve the exercise of judicial power for cases involving actual controversies. This limitation on the exercise of judicial power to justiciable controversies is rooted in judicial adherence to the doctrine of separation of powers." (citations omitted)). Of course, there is nothing inherently improper about a court, in deciding an issue properly before it, to render an opinion that also includes dicta. *See* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1253 (2006) ("What is problematic is not the utterance of dicta, but the failure to distinguish between holding and dictum."). To the contrary—dicta may, where appropriate, serve a variety of useful purposes, including providing preliminary guidance to the bench, bar, and public for future cases. *See id.* Today's majority opinion does just

that when it discusses the prior and current versions of Florida Rule of Civil Procedure 1.200, even though the prior version of the rule is the only version of the rule at issue in this case. However, courts must be vigilant to distinguish holdings from dicta. *See Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020). Although dicta of a higher court should be carefully considered by lower courts, unlike a higher court's holdings, a higher court's dicta neither horizontally constrains the higher court nor vertically binds the lower courts because dicta is not precedent. *See Sims v. State*, 743 So. 2d 97, 99 (Fla. 1st DCA 1999) ("While dicta from the Florida Supreme Court may afford welcome guidance, such passages lack the binding force of precedent." (citation and italics omitted)); *see generally Stare Decisis*, *Black's Law Dictionary* (12th ed. 2024) ("The doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation."). Dicta must therefore be viewed with "caution," as it represents a court's non-binding, preliminary view of an issue that is not yet before it. *See Huie v. Dent & Cook, P.A.*, 635 So. 2d 111, 113 (Fla. 2d DCA 1994). Judges should not mechanically follow dicta, lest they abdicate their duty to decide the issues before them. *See* Leval, *supra*, at 1282 ("If a rule was declared only in dictum, the question remains undecided, and we have a constitutional duty to make our own determination of the answer. Unless we do, we have not done our job."). In this case, the majority opinion has respectfully considered the majority opinion in *Binger v.*

*King Pest Control*, 401 So. 2d 1310 (Fla. 1981), carefully distinguished between the holdings and dicta of *Binger* pursuant to *Pedroza* as is this court's duty, decided the issues presented in this case from first principles in the absence of binding precedent—including whether *Binger* requires a trial court to find that the opposing party would be prejudiced by the introduction of testimony of an undisclosed or late-disclosed witness, or by the introduction of a late-disclosed expert opinion, before excluding the witness's testimony—and offered a few appropriate dicta statements regarding the current version of rule 1.200. In doing so, the majority opinion has certified conflict so that the Florida Supreme Court may authoritatively speak to the certified-conflict issue. Of course, our court will respectfully follow any decision by our supreme court resolving that conflict. *See generally* art. V, §§ 1-6, Fla. Const. (structurally delineating between Florida's courts, including its supreme court, district courts of appeal, circuit courts, and county courts).

Second, and relatedly, whether a statement by the Florida Supreme Court in a majority opinion in a conflict jurisdiction case constitutes a holding or dicta flows from the Florida Constitution and *Pedroza*. The Florida Constitution provides that "[t]he supreme court . . . [m]ay review any *decision* of a district court of appeal . . . that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law." Art. V, § 3(b)(3), Fla. Const. (emphasis added). It also provides that "[t]he supreme court . . . [m]ay review any

48

*decision* of a district court of appeal . . . that is certified by it to be in direct conflict with a decision of another district court of appeal." Art. V, § 3(b)(4), Fla. Const. (emphasis added). Thus, the focus of the supreme court's jurisdiction in an express-and-direct-conflict case or a certified-conflict case—or any other case under article V, section 3(b)(3)-(4)—is its review of a specific district court *decision*. In *Pedroza*—a certified-conflict case—the Florida Supreme Court reviewed the decision of the Fourth District Court of Appeal in *Pedroza v. State*, 244 So. 3d 1128 (Fla. 4th DCA 2018), and addressed the issue of "whether Pedroza's forty-year sentence for second-degree murder [was] unconstitutional under the Eighth Amendment to the United States Constitution as interpreted and applied in *Miller v. Alabama*, 567 U.S. 460 (2012)." *Pedroza*, 291 So. 3d at 543. The supreme court held in *Pedroza* among other things that "[a]ny statement of law in a judicial opinion that is not a holding is dictum" and "[a] holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." *Id.* at 547 (first citing to and then quoting from *State v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) (Canady, J., specially concurring) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005))). These holdings were necessary to the supreme court's decision in *Pedroza* because, as a part of deciding the issue presented, the supreme court went on to examine two prior supreme court

49

decisions to determine whether relevant language in those decisions constituted dicta or a holding and, if the latter, whether the supreme court should recede from any such holding. *See id.* at 547-49. The first of the two decisions—*Kelsey v. State*, 206 So. 3d 5 (Fla. 2016)—was a certified-question case (as the Florida Constitution allows district courts to pass upon and certify questions of great public importance under article V, section 3(b)(4)). The second of the two decisions—*Johnson v. State*, 215 So. 3d 1237 (Fla. 2017)—was a certified-conflict case. In discussing *Kelsey* and *Johnson*, the supreme court in *Pedroza* focused on the underlying facts that led to the decisions in *Kelsey* and *Johnson*. *Pedroza*, 291 So. 3d at 547-48. In doing so, the supreme court emphasized that *Kelsey* "limit[ed] the holding to the narrowest issue presented by the facts of the case" whereas *Johnson* "clearly st[ood] for a rule of law much broader than the facts required." *Id.* at 548. Ultimately, in deciding the issue presented, *Pedroza* read *Kelsey* narrowly and receded from *Johnson*. *See id.* at 547-49. All that to say, as a general proposition, a statement by the supreme court in a conflict jurisdiction case—or any other case under article V, section 3(b)(3)-(4)— has to be tethered to the district court decision on review and the facts underlying that case in order for a statement to be a holding and not dicta under *Pedroza*.[17] As

_____

[17] In the context of conflict jurisdiction, the district court decision on review is reviewed in relation to the other decision or decisions the Florida Supreme Court deems the district court decision on review to be in conflict with. *See* art. V, § 3(b)(3)-(4), Fla. Const. But the primary focus of the Florida Supreme Court's

50

applied to *Binger*, that means that a statement by the supreme court in *Binger* would need to be tethered to the Fourth District Court of Appeal's decision in *King Pest Control v. Binger*, 379 So. 2d 660 (Fla. 4th DCA 1980), and the facts underlying that case in order for a statement in *Binger* to be a holding and not dicta under *Pedroza*.[18] And as explained by the majority opinion in this case, "the Supreme Court's statement in *Binger*—that if the trial court finds that the undisclosed witness will not prejudice the other party after considering the factors listed in *Binger*, then the witness should be allowed to testify—was dictum" under *Pedroza* because "[t]he issue actually decided in *Binger*—based upon its facts—was that the trial court

---

review remains on the district court decision on review. *See* art. V, § 3(b)(3)-(4), Fla. Const.

[18] *Binger* was decided pursuant to the Florida Supreme Court's then-existing certiorari conflict jurisdiction, as the 1980 amendments to article V, section (3)(b) of the Florida Constitution took effect April 1, 1980, after the Fourth District decided its decision in *King Pest Control v. Binger*, 379 So. 2d 660 (Fla. 4th DCA 1980), on January 16, 1980, and after certiorari jurisdiction was invoked in the Florida Supreme Court. *See LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325, 325 (Fla. 1980) (exercising certiorari jurisdiction "under article V, section 3(b)(3), as it existed prior to April 1, 1980"). Nevertheless, the same general reasoning regarding the Florida Supreme Court's current conflict jurisdiction—i.e., that a statement by the supreme court in a conflict jurisdiction case has to be tethered to the district court decision on review and the facts underlying that case in order for a statement to be a holding and not dicta under *Pedroza*—applies to its then-existing certiorari conflict jurisdiction authorized by the 1973 amendments to article V, section 3(b)(3) of the Florida Constitution which took effect January 1, 1973. *See generally* art. V, § 3(b)(3), Fla. Const. (1973) ("The supreme court . . . [m]ay review by certiorari any *decision* of a district court of appeal . . . that is in direct conflict with a decision of any district court of appeal or of the supreme court on the same question of law . . . ." (emphasis added)); *Goodman v. Olsen*, 278 So. 2d 612, 613 n.1 (Fla. 1973).

51

should not have permitted the plaintiffs to introduce the undisclosed witness's testimony where the defendant would suffer prejudice from the undisclosed witness's testimony." Maj. op. at 12.

And third, and finally, regardless of whether the Florida Supreme Court accepts jurisdiction to resolve the majority opinion's certified conflict and agrees with our interpretation of *Binger* (as well as our interpretation of the prior version of rule 1.200), I respectfully submit that the Florida Supreme Court should consider amending Florida Rule of Civil Procedure 1.200 to make clear beyond any possible doubt—either within rule 1.200 or the commentary to the rule—that *Binger* was premised on a prior version of rule 1.200 and that *Binger*'s interpretation of the prior version of rule 1.200 does not govern the current version of rule 1.200. The prior version of rule 1.200 is clearly and materially distinguishable from the current version of rule 1.200. *See generally* maj. op. at 21-24 & nn. 7-8. Nevertheless, many trial courts may still be laboring under the misimpression that they must continue to follow each and every statement in *Binger*—presumably because their own district courts of appeal have not yet had occasion to interpret and apply the substantial revision to rule 1.200 that went into effect on January 1, 2025. In turn, this may mean that the current version of rule 1.200 is not being fully implemented by Florida's trial courts—to the detriment of the "just, speedy, and inexpensive determination of every action," Fla. R. Civ. P. 1.010, and contrary to the Florida Constitution's

expectation that the supreme court's rules for practice and procedure will be uniformly applied "in all courts," art. V, § 2(a), Fla. Const.[19] The Florida Supreme Court need not wait for a controversy to arise regarding the meaning of the current version of rule 1.200 to provide additional guidance and clarity to Florida's trial courts by means of an amendment to rule 1.200 or the commentary to the rule. *See* art. V, § 2(a), Fla. Const.

With these observations, I concur in the majority's opinion.

STARGEL, J., concurs.

_____

SMITH, J., concurring in result only.

## I.       Introduction

*Binger*[20] expressly defined the issue it was facing under the facts of the case before it: to reconcile conflicting district court opinions on how trial courts are to handle late-disclosed witnesses. The Florida Supreme Court then set forth in *Binger* a standard for trial courts to apply when faced with the decision to admit or exclude late-disclosed witnesses. The majority reads *Binger* as limited to admission of late disclosed witness testimony despite clear language in *Binger* to the contrary and the

---

[19] Of course, not every statement in *Binger* fails to survive the rewrite of rule 1.200. For example, *Binger*'s holding that "all problems regarding the testimony of undisclosed witnesses [are placed] within the broad discretion of the trial judge" has not been displaced by the current version of rule 1.200. *Binger*, 401 So. 2d at 1313.

[20] *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981).

reality that admission and exclusion are two sides of the same coin. *Binger*'s application to the facts of this case can only be ignored at the risk of diminishing our state's highest court's ability to clarify the issues it decides in the opinions it writes. That is a risk not worth taking, especially here where recent rule amendments have resolved any deleterious effects of *Binger*. While, as a former practitioner and trial judge, I empathize with the deep frustration expressed by the majority relative to effect of *Binger* on case management over the years, I am constrained to concur in result only, guided by the "foundational premise that '[w]here an issue has been decided in the Supreme Court of the state, the lower courts are bound to adhere to the Court's ruling when considering similar issues, even though the court might believe that the law should be otherwise.'" *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 191 (Fla. 2025) (quoting *State v. Dwyer*, 332 So. 2d 333, 335 (Fla. 1976)).

## II.    Analysis

*A.    Whether to Apply* Binger *in the Present Case*

*1. Factual and procedural background of* Binger.

The Bingers sued King Pest Control for alleged injuries arising from an automobile accident.[21] The trial court issued a pretrial order requiring exchange of

---

[21] The underlying facts of *Binger* were not fully laid out by the Florida Supreme Court but were adopted by the court from the Fourth District Court of Appeal's underlying opinion, *King Pest Control v. Binger*, 379 So. 2d 660 (Fla. 4th

54

witness names twenty days prior to trial. *Binger*, 401 So. 2d at 1311. Despite this requirement, the Bingers were permitted, over objection, to use a rebuttal expert witness at trial that they had not previously disclosed. *Id*. King Pest Control appealed, and the Fourth District Court of Appeal held that a trial court must make a prejudice determination when deciding whether to admit or exclude testimony from an undisclosed or untimely disclosed witness:

> Should either party offer an unlisted witness, objection by the opposition requires the trial judge to determine whether the witness should be allowed. If no prejudice will accrue to the objecting party, the witness should be heard. On the other hand, if the objector will be prejudiced, then the court must determine whether the party offering the witness should have foreseen the eventuality of needing to call the witness. Prejudice, of course, does not mean that the witness will testify favorably to the side calling him. Rather, it means that the objecting party might well have taken some action to protect himself had he timely notice of the witness and that there exist no other alternatives to alleviate the prejudice[.]

*King Pest Control v. Binger*, 379 So. 2d 600, 663 (Fla. 4th DCA 1980) (internal citation omitted). Applying this prejudice test, the district court found that King Pest Control was prejudiced, and, therefore, reversed. *Id*.

On certiorari review, the Florida Supreme Court approved the decision of the Fourth District with some expansion on the prejudice test. 401 So. 2d at 1311 ("We essentially agree with the district court's analysis."). *Binger* premised its analysis

---

DCA 1980). Any reference in this concurring opinion to "*Binger*" is to the Florida Supreme Court decision unless otherwise indicated.

on "existing" Florida Rule of Civil Procedure 1.200, adherence to basic "notions of discovery," and discretion of trial judges. 401 So. 2d at 1312 ("Existing Rule 1.200 . . . provides an adequate framework, when supplemented by a faithful adherence to the notions of discovery which underpin civil trial practice and the good judgment of Florida's trial judges."). *Binger* identified several different approaches trial courts were currently using to tackle the problem of pretrial witness disclosures, such as not requiring impeachment witnesses to be disclosed, not requiring disclosure of rebuttal witnesses "subject to the trial judge's discretion," and not requiring disclosure of witnesses who will respond to "new or surprise" trial testimony. *Id*. at 1312. *Binger* rejected all of these as inadequate to "resolve this thorny problem in the midst of trial." *Id*. at 1312-13 (quoting 379 So. 2d at 662).

*Binger*, instead, endorsed a fourth approach, which a "vast majority of district courts" had adopted, including the Fourth District. *Id.* at 1313. "That approach places all problems regarding the testimony of undisclosed witnesses within the broad discretion of the trial judge." *Id.* The court went on to provide guidance to the trial courts in exercising that discretion, commonly referred to as the "*Binger* test":

> It follows, of course, that a trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by *a determination as to whether use of the undisclosed witness will prejudice the objecting party*. Prejudice in this sense refers to the

surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: *(i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness*; *(ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order*; and *(iii) the possible disruption of the orderly and efficient trial of the case* (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

*Id*. at 1313-14 (emphasis added) (internal citations omitted). The rule announced by the court was not limited to a trial court's determination to admit but also expressly applied to exclusion as well. Applying this test, the *Binger* court found that the non-disclosure was intentional, that it caused "surprise and disruption," that there was an "inability to alleviate," and that King Pest Control was prejudiced. *Id*. at 1314-15. The court concluded that the Fourth District correctly ordered a new trial due to the trial court's erroneous ruling permitting the Bingers' undisclosed witness to testify. *Id*.

2. *Does* Binger*'s holding apply to the trial court's decision to exclude as well as admit untimely disclosed witness testimony under the* Pedroza[22] *test?*

In rejecting application of *Binger*, despite clear language in *Binger* stating it applied to decisions to admit as well as exclude, the majority asserts the *Binger* decision should be limited to wrongful admission of undisclosed testimony. The

_____

[22] *Pedroza v. State*, 291 So. 3d 541 (Fla. 2020).

majority concludes that any portion of *Binger* that may speak to a court's decision to exclude undisclosed testimony is "pure dictum":

> In sum, *Binger* concerned undisclosed witness testimony that was improperly allowed and should have been excluded due to prejudice to the other party. *Binger* did *not* concern undisclosed testimony that was improperly excluded or what the trial court should have considered before excluding undisclosed testimony. Thus, per *Pedroza*, the holding of *Binger* is that where a party fails to disclose a witness by the deadline set forth in a pretrial order, the trial court must consider prejudice to the other party before exercising discretion to *allow* the testimony. The Supreme Court's statement about what a trial court should consider before *excluding* an undisclosed witness's testimony was pure dictum.

*Ante*, p. 12-13. Following the analysis method modeled to us in *Pedroza* in determining what constitutes a holding, I reach the opposite conclusion.

As the majority observes, the Florida Supreme Court in *Pedroza* recently provided clear direction for lower courts in discerning holding versus dictum. Pedroza was sentenced to forty years incarceration for second-degree murder—an act which she committed at the age of seventeen. 291 So. 3d at 543. She challenged her conviction as cruel and unusual punishment under the Eighth Amendment. *Id*. The supreme court considered statements from three cases that Pedroza relied on and analyzed whether each statement was a holding, or, a "statement of law in a judicial opinion that is not a holding," i.e. dictum. *Id*. at 547 (citing *State. v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) (Canady, J., specially concurring)).

58

In concluding that a statement in the case of *Kelsey v. State* that "all juvenile offenders whose sentences [are] . . . longer than twenty years [] are entitled to judicial review,"[23] was dictum, the *Pedroza* court provided the following three-pronged test: "A holding consists of those propositions along the *chosen decisional path* or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." *Id.* (emphasis added) (quoting *Yule*, 905 So. 2d at 259 n.10). The *Pedroza* court explained that *Kelsey* addressed a narrowed, certified question that did not require addressing the length of Kelsey's sentence as the court had done in dictum:

> It was *not necessary* for this Court to address whether *the length of Kelsey's sentence* implicated *Graham*, as the <u>narrow issue we framed</u> when we rephrased the certified question—whether "a defendant whose original sentence violated *Graham* . . . and who was subsequently resentenced prior to July 1, 2014, [is] entitled to be resentenced pursuant to the provisions of chapter 2014-220"—was dispositive. *Kelsey*, 206 So. 3d at 6.

291 So. 3d at 547 (emphasis added). The court ultimately opined that the language of *Kelsey* mandating review on juvenile sentences longer than twenty years was dictum "[g]iven that the Court in *Kelsey* **expressly and repeatedly stated** that it was **narrowly deciding only the issue framed** by the rephrased certified question, and that the 'decisional path' or 'path of reasoning' in *Kelsey* is less than clear[.]" *Id.* at 547-48 (emphasis added).

---

[23] *Id.* (quoting *Kelsey v. State*, 206 So. 3d 3, 8 (Fla. 2016)).

Applying the three-pronged *Pedroza* test, it is clear the *Binger* court's holding addresses what test trial courts are to apply when facing late or undisclosed witness testimony.

        *a.* Pedroza *factor 1—Actually decided.*

To determine what *Binger* "actually decided," we look to how the court framed the issue from the outset of the case: "In this civil proceeding, we endeavor to reconcile conflicting district court decisions *regarding the effect of a pretrial failure to disclose the names of witnesses*." 401 So. 2d at 1311 (emphasis added). Throughout the opinion, the court continued with similar language regarding a trial court's handling of the failure to disclose witness names, and at no point did the court limit its opinion to only a decision of admission rather than exclusion:

- "The Bingers argue here that the law in Florida is well-settled to the effect that impeachment witnesses *need not be disclosed* prior to trial."

- "[W]e accept neither the Bingers' nor King Pest Control's view of the *role of witness disclosure* in civil trial practice."

- "Conceding, however, the existence of a confusing string of *witness disclosure* cases[.]"

- "Florida's district courts seem to have taken four approaches to the problem of *pretrial witness disclosure*."

- "That approach places all problems regarding the *testimony of undisclosed witnesses* within the broad discretion of the trial judge."

- "The only prior decision of this Court directly addressing *the issue of witness disclosure* leaned toward this fourth approach."

60

*Id.* at 1311-13 (emphasis added).

As the *Binger* court was "endeavor[ing] to reconcile conflicting district court decisions" regarding the standard applied by trial courts when faced with late disclosed witnesses, 401 So. 2d at 1311, it must be considered, then, whether those district court decisions were limited to cases involving admission of late disclosed evidence or whether they addressed both admission and exclusion. The following is a chart of all district court opinions addressed by *Binger* in this context and whether the underlying trial courts admitted or excluded the witnesses:

| DCA CASES EXPRESSLY LISTED/DISCUSSED IN BINGER | WHETHER TRIAL COURT ADMITTED OR EXCLUDED WITNESS TESTIMONY |
|---|---|
| *King Pest Control v. Binger*, 379 So. 2d 660 (Fla. 4th DCA 1980) | ADMITTED |
| *Mall Motel Corp. v. Wayside Rests., Inc.*, 377 So. 2d 41 (Fla. 3d DCA 1979) | EXCLUDED |
| *Hartstone Concrete Prod. Co. v. Ivancevich*, 200 So. 2d 234 (Fla. 2d DCA 1967) | EXCLUDED |
| *A.A. Holiday Rent-A-Car, Inc. v. Edwards*, 190 So. 2d 362 (Fla. 3d DCA 1966) | EXCLUDED |
| *Williamson Truck Lines, Inc. v. Kellar*, 301 So. 2d 818 (Fla. 3d DCA 1974) | ADMITTED |
| *Atlas v. Siso*, 188 So. 2d 344 (Fla. 3d DCA 1966) | EXCLUDED |
| *Fuller v. Rinebolt*, 382 So. 2d 1239 (Fla 4th DCA 1980) | ADMITTED |
| *McDonald Air Conditioning, Inc. v. John Brown, Inc.*, 285 So. 2d 697 (Fla 4th DCA 1973) | EXCLUDED |
| *Green v. Shoop*, 240 So. 2d 85 (Fla. 3d DCA 1970) | EXCLUDED |
| *Brevard Cnty. v. Interstate Eng'g Co.*, 224 So. 2d 786 (Fla. 4th DCA 1969) | EXCLUDED |

| *Alvarez v. Mauney,* 175 So. 2d 57 (Fla. 2d DCA 1965) | EXCLUDED |
|---|---|
| TOTALS: | ADMISSION: 3 |
| | EXCLUSION: 8 |

Thus, not only did *Binger* expressly state that it was addressing the issue of late-disclosed witnesses which would encompass both the decision to admit as well as to exclude, the district court opinions analyzed by the *Binger* court also confirm that the supreme court was addressing both scenarios.

In addition to addressing both exclusion and admission, several of the district court cases noted above expressly discussed whether a prejudice standard should be applied or whether a trial court should be permitted to strictly enforce without regard to the effect on the objecting party. For starters, in the very case analyzed by *Binger*, that being *King Pest Control v. Binger*, the Fourth District proposed that the trial court consider prejudice to the objecting party when deciding whether to exclude the late-disclosed witness: "Should either party offer an unlisted witness, objection by the opposition requires the trial judge to determine whether the witness should be allowed. *If no prejudice will accrue to the objecting party, the witness should be heard.*" 379 So. 2d at 663 (emphasis added). A similar test was set out in *Fuller v. Rinebolt*, another case *Binger* analyzed:

> [T]he trial court has broad discretion in determining whether or not to allow a witness to testify where the opposing party has not had prior notice as to his identity. . . . [W]hile the lower court may exclude the testimony of a witness **if the testimony is prejudicial to a party**, the

**testimony should be allowed in the absence of a showing of such prejudice**.

382 So. 2d 1239, 1241 (Fla. 4th DCA 1980) (emphasis added) (citing *Colonnell v. Mitchels*, 317 So. 2d 799 (Fla. 2d DCA 1975)). Contrarily, another decision cited in *Binger* concluded that strict enforcement without regard to the effect on the objecting party was the appropriate standard:

> We have not overlooked the thrust of the argument that the witness was an expert and as such not subject to the wide area of discovery procedures to which other types of witnesses are exposed. Or that as an expert his testimony could not surprise the plaintiff. **Notwithstanding** the status of the witness as an expert nor **the lack of surprise the trial court has the inherent authority to insist upon compliance** with any reasonably imposed pretrial requirements designed to expedite the trial of litigated matters.

*Brevard Cnty. v. Interstate Eng'g Co.*, 224 So. 2d 786, 788 (Fla. 4th DCA 1969) (emphasis added).

Although not a district court decision, *Binger* also analyzed and synthesized into its holding *Rose v. Yuille*, 88 So. 2d 318 (Fla. 1956), which the supreme court described as "[t]he only prior decision of this Court directly addressing the issue of witness disclosure." 401 So. 2d at 1313. In *Rose*, the supreme court addressed whether a trial court abused its discretion in excluding a late-disclosed witness, the exact scenario which the majority here claims the *Binger* holding should not extend.

Thus, after considering how the *Binger* court framed the issue it was addressing, *and* examining the cases analyzed by *Binger*, the issue "actually

63

decided" was establishing a test for trial courts to apply when faced with the decision to admit or exclude late-disclosed witness testimony.

    *b.* Pedroza *factor 2—Based on the facts of the case.*

In *Binger*, the trial court was faced with the question of whether to admit or exclude a witness that the plaintiff had not disclosed in its witness list as required by a pretrial order. The *Binger* court announced a test for courts to apply when faced with such late disclosure. Thus, the holding of the case, the test which was articulated by *Binger*, was based on these pertinent facts.

    *c.* Pedroza *factor 3—Led to the judgment.*

*Binger* articulated a test for how trial courts were to exercise their discretion in dealing with late-disclosed witness testimony:

> It follows, of course, that a trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by *a determination as to whether use of the undisclosed witness will prejudice the objecting party*. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: *(i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness*; *(ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order*; and *(iii) the possible disruption of the orderly and efficient trial of the case* (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

64

*Id*. at 1313-14 (emphasis added) (citations omitted). *Binger* then applied this test to the facts of the case before it and concluded that all factors supported the Fourth District's decision to grant a new trial. As to the factor of "the calling party's possible intentional, or bad faith, noncompliance with the pretrial order," the court noted that the Bingers "knew, of course who [the undisclosed witness] was and what he would say," and that there was "intentional nondisclosure." *Id*. at 1314. As to the factor of prejudice, which the court defined as "surprise in fact of the objecting party," as well as the factor of "possible disruption of the orderly and efficient trial of the case," *Binger* noted the "surprise and disruption occasioned by the use of the unlisted witness." *Id*. Finally, as to the factor of "the objecting party's ability to cure the prejudice," the court pointed out King Pest Control's "inability to alleviate these problems." *Id*. at 1314-15. Having considered all the factors of the "*Binger* test," the *Binger* court concluded that the Fourth District was "correct in directing a new trial." *Id*. at 1315.

This articulated test resolved the central issue of *Binger*, that being to "reconcile conflicting district court decisions regarding the effect of a pretrial failure to disclose the names of witnesses." 401 So. 2d at 1311. As previously discussed, the district court decisions were in conflict as to whether prejudice to the objecting party should be considered or whether trial courts should be permitted to strictly enforce their orders. Thus, the test announced by the court clearly led to the

65

judgment of reconciling conflicting district court opinions into a singular, uniform standard for trial courts to use when facing late-disclosed witnesses.

I recognize the majority reaches the opposite conclusion in applying its *Pedroza* analysis, and I would respectfully say that may be due to the majority's sole focus on the factual prong of the *Pedroza* test. The majority opines as follows:

> Applying the framework set forth in *Pedroza*, the Supreme Court's statement in *Binger* – that if the trial court finds that the undisclosed witness will not prejudice the other party after considering the factors listed in *Binger*, then the witness should be allowed to testify – was dictum. The facts of *Binger* were that the trial court allowed the plaintiffs to introduce testimony from a witness that the plaintiffs failed to disclose by the deadline set forth in the pretrial order. The Florida Supreme Court found that the defendant was prejudiced by the testimony of the undisclosed witness. The issue actually decided in *Binger* – based upon its facts – was that the trial court should not have permitted the plaintiffs to introduce the undisclosed witness's testimony where the defendant would suffer prejudice from the undisclosed witness's testimony.

*Ante*, at 12. I concede that the majority is correct that the facts of *Binger* involve admission of late-disclosed witness testimony, and the majority would in turn need to concede that the trial court in *Binger* was faced with the question of whether to admit or exclude the subject late-disclosed witness testimony. The question is whether the decision to admit was a part of the chosen decisional path of *Binger*. When all three portions of the *Pedroza* analysis are considered in tandem, that being (1) what is actually decided, (2) based upon the facts of the case, and (3) which leads

66

to the judgment, *Binger*'s holding concerns the broader issue of what standard trial courts are to apply when faced with late-disclosed witness testimony.

The majority's analysis focuses solely on certain facts of *Binger* without sufficient consideration of how the supreme court framed the issue it was facing. *Pedroza* is instructive on this point. As discussed above, *Pedroza* addressed a statement in *Kelsey v. State* where the *Kelsey* court opined: "[W]e conclude that our decision in *Henry v. State*, 175 So. 3d 675 (Fla. 2015), requires that all juvenile offenders whose sentences meet the standard defined by the Legislature in chapter 2014–220, a sentence longer than twenty years, are entitled to judicial review." *Kelsey*, 206 So. 3d at 8. In deciding whether to treat this statement as dicta versus holding, *Pedroza* focused on how the *Kelsey* court expressly defined the issue it was facing, which was: "[W]hether 'a defendant whose original sentence violated *Graham* [*v. Florida*, 560 U.S. 48 (2010)] . . . and who was subsequently resentenced prior to July 1, 2014, [is] entitled to be resentenced pursuant to the provisions of chapter 2014-220.'" 291 So. 3d at 547 (quoting *Kelsey*, 206 So. 3d at 6). Because the issue framed in *Kelsey* involved whether Kelsey's *original* sentence violated *Graham* (which it clearly did),[24] it was unnecessary for the court to reach

---

[24] In *Graham*, the Supreme Court held that a life sentence without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment when imposed for nonhomicide offenses committed by a juvenile. 560 U.S. at 74.

whether Kelsey's *current* sentence (which was not his original sentence, but a product of a resentence) entitled him to another resentencing:

> Given that the Court in *Kelsey* expressly and repeatedly stated that it was narrowly deciding only the issue framed by the rephrased certified question, and that the "decisional path" or "path of reasoning" in *Kelsey* is less than clear, it makes more sense to read the questionable language as a statement of the necessity of including judicial review and an opportunity for early release in the remedy for any *Graham* violation and not as a means of defining when an Eighth Amendment violation occurs.

291 So. 3d at 547-48. Thus, the *Pedroza* court looked at how the issue was framed by the deciding court in determining the scope of the *Kelsey* court's holding.

In similar fashion, the *Binger* court framed the issue it was facing at the outset of the case: "In this civil proceeding, we endeavor to reconcile conflicting district court decisions *regarding the effect of a pretrial failure to disclose the names of witnesses*." 401 So. 2d at 1311 (emphasis added). The supreme court reiterated this view of the issue throughout the opinion. Pursuant to *Pedroza*, it is appropriate to look at how the supreme court defines the issue before it when attempting to discern the decisional path and binding holding from the case. The *Binger* court framed the issue it was addressing as the broader question of resolving conflicting district court opinions on how trial courts are to handle late-disclosed witnesses, and not a limited scope of admission only.

In reaching this conclusion, I am mindful of our supreme court's self-limiting guidance from *Thourtman v. Junior*:

> Because the issue of detention beyond first appearance pending a bail hearing was not raised by the facts in *Arthur*, implicated by either of the certified questions in *Arthur*, or analyzed or discussed in *Arthur*, the language from *Arthur* relied on by Thourtman—**despite the fact that it was self-described as a holding—constitutes dicta** and does not control our decision here.

338 So. 3d 207, 212 (Fla. 2022) (emphasis added). It is true that merely stating "we hold" does not make something a holding. I see that as starkly different from our present case where *Binger* did not simply say "we hold," but rather defined the issue before it, and that issue was based on facts before the supreme court. While *Thourtman* stands for the proposition that appellate courts do not have the power to reach any issue they please by saying "we hold," *Pedroza* gives necessary latitude to appellate courts to define the issues before them from existing facts before them.

   3. *Two additional arguments raised by the majority.*

   I will close this portion of my analysis by addressing two additional points raised by the majority: (1) whether it is inappropriate to apply *Binger* to changed or undisclosed witness testimony as opposed to only circumstances involving the failure to disclose a witness's name; and (2) whether a "strict enforcement" standard exists apart from *Binger*, and whether the January 2025 rule changes "buttress" that alleged "strict enforcement" standard.

   a. *Application of* Binger *to changed or undisclosed witness testimony*

   First, the majority briefly claims that district courts have improperly extended *Binger* to cases involving not just undisclosed witness names, but undisclosed,

69

changed witness testimony. The majority does not clarify its reasoning nor does it tie that observation to its holding. The question of whether *Binger* applies to changed witness testimony was recently addressed and decided by our court in *Richardson v. Tenery*, 422 So. 3d 1216 (Fla. 6th DCA 2025), and the majority presents no argument as to why this court should recede from its holding in *Richardson*.

In *Richardson*, the plaintiff disclosed a treating medical doctor as one of her witnesses. 422 So. 3d at 1218. At trial, the defense objected when the doctor testified as to the cost of plaintiff's future medical care. 422 So. 3d at 1220. The trial court overruled the objection and the defendant challenged the decision on appeal. *Id.* This court analyzed the trial court's admission under *Binger*, and we held that the defendant was prejudiced by the admission of the undisclosed opinion testimony: "[W]e conclude that the trial court abused its discretion in finding that no *Binger* violation occurred when Tenery offered the undisclosed expert opinion of Dr. BiFulco regarding her future medical treatment and costs." 422 So. 3d at 1226. Thus, we applied *Binger* in the context of a disclosed witness who attempted to provide testimony beyond what was timely disclosed pursuant to the pretrial order.

In addition to the Sixth District, all districts have applied *Binger* to matters involving undisclosed, changed witness testimony. *See Miller v. Conney*, 413 So. 3d 306, 309 (Fla. 1st DCA 2025) ("Although *Binger* involved an undisclosed

70

witness, the *Binger* analysis has subsequently been applied to cases where an expert changes his or her opinion or gives a new opinion, which results in surprise and prejudice to the opposing party.") (quotations omitted); *Moore v. Gillett*, 96 So. 3d 933, 941 (Fla. 2d DCA 2012) (applying *Binger* to review whether testimony by previously disclosed expert that objecting party claimed was "new" or in conflict with prior testimony should have been excluded, and concluding trial court did not err in admitting testimony); *Scarlett v. Ouellette*, 948 So. 2d 859, 862 (Fla. 3d DCA 2007) ("In order for the trial court to exclude a witness or a witness' testimony from trial, the objecting party must establish that he or she was 'surprised in fact' by the undisclosed witness or testimony."); *Grau v. Branham*, 626 So. 2d 1059, 1061 (Fla. 4th DCA 1993) ("Using a *Binger* analysis on this case . . . we find that the defendant was surprised in fact by the changed testimony of the two doctors."); *Cooper v. Gonzalez*, 374 So. 3d 841, 843–44 (Fla. 5th DCA 2023) ("*Binger* and its progeny provide that testimony, such as previously undisclosed expert testimony in the form of a new witness, undisclosed opinion, or substantially changed opinion, may be excluded when it is first offered after a critical point in time, if allowing it would result in surprise and substantial prejudice."). The Florida Supreme Court has arguably adopted this approach as well. *See Scipio v. State*, 928 So. 2d 1138, 1145 (Fla. 2006) ("Similarly, as this Court concluded in *Evans* . . . in finding error in a litigant's failure to disclose a change in an expert's opinion, '[a] party can hardly

71

prepare for an opinion that it doesn't know about, much less one that is a complete reversal of the opinion it has been provided.'" (quoting *Off. Depot, Inc. v. Miller*, 584 So. 2d 587, 590 (Fla. 4th DCA 1991))).

Beyond the fact that this Court has already applied *Binger* in this context in *Richardson* as discussed above, the application of *Binger* to undisclosed witness testimony is both logical and appropriate. A changed or undisclosed expert opinion in violation of a pretrial order can be "tantamount to permitting an undisclosed adverse witness to testify." *Dep't of HRS v. J.B. By & Through Spivak*, 675 So. 2d 241, 244 (Fla. 4th DCA 1996); *see also Grau*, 626 So. 2d at 1061 ("*Binger* dealt with the failure to disclose a witness, although its teachings have been applied where the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify."). Again, while it does not appear the majority in any way pursues this argument, cases from our court, all other districts, and the Florida Supreme Court indicate that *Binger* is appropriately applied to circumstances of changed witness testimony.

> b. *Whether a "strict enforcement" standard exists apart from* Binger, *and whether the January 2025 rule changes buttress that alleged "strict enforcement" standard.*

Second, the majority claims that a strict enforcement standard exists apart from *Binger* and that certain, recent rule amendments "buttress" the majority's position that strict enforcement was the existing standard prior to the rule

amendments taking effect. I do not agree that the 2025 rule amendments provide guidance as to what standard existed during the trial of this case in June 2024, nor do I agree that the law is clear that a strict enforcement standard existed relative to a trial court's decision to exclude late-disclosed witness testimony during that same timeframe.

The majority concedes that on January 1, 2025, significant rule changes went into effect regarding a trial court's abilities to enforce pretrial orders:

> The new version of Rule 1.200, which became effective January 1, 2025, . . . now imposes an affirmative duty on trial courts to enter a case management order which specifies a deadline for "completion of expert discovery." Fla. R. Civ. P. 1.200(d)(2)(E) (2025). The rule now also provides that "[t]he case management order *must* indicate that the deadlines established in the order will be *strictly enforced* unless changed by court order." Fla. R. Civ. P. 1.200(d)(3) (2025) (emphasis added). Subsection (e)(1) reiterates this requirement, again stating that "Deadlines in a case management order must be *strictly enforced* unless changed by court order." Fla. R. Civ. P. 1.200(e)(1) (2025) (emphasis added).

> . . . .

> Our sister courts' interpretation of *Binger* cannot survive the Supreme Court's mandate that case management orders be "strictly enforced." Additionally, an amendment to Florida Rule of Civil Procedure 1.380 that also took effect on January 1, 2025, sets a new standard that is different than our sister court's interpretation of *Binger* for excluding certain specific categories of undisclosed witnesses and evidence. Under Rule 1.380(d), as amended, "[i]f a party fails to provide information or identify a witness as required by rule 1.280(a) or (g), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Thus, for undisclosed witnesses or evidence falling within the scope of Rule 1.380(d), a trial court now

73

> *must* exclude the evidence unless the failure to disclose was "substantially justified or…harmless."  This is a significantly different standard than determining whether the other party would suffer prejudice under *Binger*.

> . . . .

> [T]he version of Florida Rule of Civil Procedure 1.200 in effect at the time of the proceedings below did provide that a trial court's case management order "controls the subsequent course of the action *unless modified to prevent injustice.*"  Fla. R. Civ. P. 1.200(d) (2024) (emphasis added). . . .  The current version of Rule 1.200, which became effective January 1, 2025, removes the reference to "prevent injustice" and simply provides that "Deadlines in a case management order must be strictly enforced unless changed by court order." Fla. R. Civ. P. 1.200(e)(1).

*Ante*, at 22, 22-23 n.7, 24 n.8 (emphasis in original).

At the outset, I express my agreement with the majority that the *Binger* test stands directly opposed to these recent rule changes.  At any point in the last several decades since *Binger*, the Florida Supreme Court could have provided trial courts with the ability to strictly enforce their case management orders.  In January 2025, the Florida Supreme Court appears to have done just that.  *See In re Amends. to Fla. Rules of Civ. Proc.*, 402 So. 3d 925 (Fla. 2024).  As the majority recites, among other significant changes, the supreme court amended the Florida Rules of Civil Procedure to mandate that trial courts *strictly comply* with pretrial orders which stands in direct opposition to *Binger*'s prejudice determination.  *Id.* at 931; *see* Fla. R. Civ. P. 1.200(e)(1) (2025) ("Deadlines in a case management order <u>*must be*</u> *strictly enforced* unless changed by court order." (emphasis added)); *Marine Design Dynamics, Inc.*

74

*v. All City Constr. Servs., LLC*, 50 Fla. L. Weekly D2653, D2656 (Fla. 3d DCA Dec. 17, 2025) (Gooden, J., concurring) ("But these changes [to rule 1.200] are incompatible with *Binger*. The core tension is self-evident: A judge cannot simultaneously 'strictly enforce' the discovery deadlines, as the Rules now demand, while also applying a prejudice analysis, that functionally excuses the violation of that very deadline."); *contra Lugo*, 487 So. 2d at 323 ("*[E]xclusion* of the witness *for failure to strictly comply* with the pretrial order is _indefensible_ [under a *Binger* analysis]." (emphasis added)).

While the majority claims these recent changes to the procedural rules buttress its rejection of *Binger*, rules of construction lead me to a different conclusion. Under the reenactment canon, "a significant change in language is presumed to connote a different meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012). The rule changes discussed above were significant to say the least. If the rules have undergone a significant change, then I must conclude the rules convey something different than they did before—not that the changes "buttressed" what already existed.

I concede that under the present version of the rules, trial courts now have a duty to strictly enforce their case management orders, however that was not the rule in place at the time of the trial in our case *sub judice*. Trial courts and parties to a case are governed by procedural law and rules in effect at the time of the relevant

procedural event. *See Whittaker v. Eddy*, 147 So. 868, 873 (Fla. 1933) ("It is our opinion that as a general rule the parties are governed by the law of pleading, practice, and procedure as it may exist at the time of their proceeding."); *see also State v. Espinoza*, 264 So. 3d 1055, 1059 (Fla. 3d DCA 2019) ("[W]e apply the Florida Statutes and rules of procedure as they existed at the time of the alleged conduct to the facts of this case to determine whether the trial court erred in dismissing the information filed against Espinoza."). Here, that relevant event was the exclusion of the challenged testimony based on untimely disclosure. Therefore, the state of the law and the rules of procedure in effect in June 2024, which was prior to the January 1, 2025 rule changes, must apply.

Finally, while I wish that I could agree with the majority that if *Binger* does not apply, we could merely revert to a "strict compliance" standard, I question whether that would be the case. Prior to *Binger*, the last Florida Supreme Court case that dealt with late-disclosed witnesses was *Rose v. Yuille*. *See* 401 So. 2d at 1313 (*Binger* court describing *Rose v. Yuille* as "the only prior decision of this Court directly addressing the issue of witness disclosure"). In *Rose*, the plaintiff failed to disclose a witness in accordance with the court's order at pretrial conference. *Id.* at 319. The plaintiff attempted to call the late-disclosed witness at trial, and the trial court excluded the witness's testimony entirely. *Id.* On appeal, the supreme court set forth the issue to be decided as follows: "The point for determination is whether

76

or not the trial court committed error in refusing to permit the witness C. L. Macurda to testify at the trial." *Id.* In holding that the trial court did not abuse its discretion in excluding the witness, the court opined:

> Since the testimony of Macurda was not proffered at any stage of the proceedings, there is no way to tell whether or not its rejection was injurious to the plaintiff.
>
> In his 'Notice of Disclosure' counsel for plaintiff should have advised the court and opposing counsel what Macurda would testify to, that his testimony was material and essential to prove his case and that there could be no lawful objection to its introduction in evidence. . . .
>
> Failing in this, in view of the fact that the trial court has broad discretion in conducting a trial, we find no abuse of discretion in rejecting Macurda's testimony.

*Id.* Although its reasoning was hardly robust, the supreme court outlines what appears to be a prejudice test to be applied to a trial court's decision to exclude witness testimony. I am by no means advocating for a reversion to *Rose v. Yuille*, but instead point out that the majority's formula of "no *Binger* = strict enforcement" does not square with prior existing supreme court precedent.

At bottom, the majority purports to fix a problem that has already been fixed, yet simultaneously creates a problem that need not be created. By imposing a new standard other than *Binger* on the last few remaining appeals involving late disclosure exclusions which were tried prior to January 1, 2025, we effectively pull the rug out from under the parties and trial courts who had followed *Binger* in deciding not just one, but all matters involving the pretrial late disclosure of witness

77

testimony. To the extent there may be any existing errors by trial courts that require correction on appeal, our Court is now insisting on applying a "strict enforcement" standard to the errors raised on appeal despite the fact that the *Binger* test was applied to other late disclosure issues faced throughout the trial. This is hardly a fair result for litigants who carefully conducted their trials under *Binger*. Though I stand alongside the majority's expressed concerns about *Binger*'s effect on case management (again, prior to the rule changes in January 2025 that have now negated *Binger*), I also stand with Judge Gooden's observations that *Binger* is a known standard that skilled attorneys have navigated for decades: "[*Binger* has been] a cornerstone of Florida's jurisprudence since 1981. Seasoned trial lawyers know its prejudice analysis and how to effectively navigate its contours when faced with undisclosed or late-disclosed evidence, witnesses, or testimony." *Marine Design Dynamics, Inc.*, 50 Fla. L. Weekly D2653, D2656 (Fla. 3d DCA Dec. 17, 2025) (Gooden, J., concurring). While this particular case results in a "no harm-no foul" scenario as it is an affirmance whether we apply *Binger* or not, other cases and litigants may not fare as well.

B.     *Application of* Binger *to the Present Case*

We review a trial court's decision to admit or exclude witness testimony under *Binger* for abuse of discretion. *See Monzón v. R.J. Reynolds Tobacco Co.*, 388 So. 3d 930, 931 (Fla. 3d DCA 2024) ("[The] standard of review on a trial court's

78

evidentiary rulings is abuse of discretion." (quotation omitted)); *see also Walerowicz v. Armand-Hosang*, 248 So. 3d 140, 146 (Fla. 4th DCA 2018) ("Admission or exclusion of the testimony of a witness in violation of a trial preparation order is within the trial court's discretion." (citing *Binger*, 401 So. 2d at 1313-14)).

Along with prejudice to the opposing party (defined as that involving "surprise in fact"), the three additional factors set forth in *Binger* when analyzing exclusion of testimonial evidence are:

> (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases).

401 So. 2d at 1314. *Binger* also expressly permits trial courts to consider "any other factors that are relevant." *Id*.

Application of *Binger* to the present facts results in an unremarkable affirmance. Appellee's two expert witnesses were disclosed well past the court-ordered deadline, and the opinions were produced so close to trial that Appellant would not have had sufficient time to prepare an appropriate response to the same. The trial court was faced with either a disruption of the orderly and efficient trial of the case if a continuance would have been granted, or substantial unfairness to Appellee if trial continued forward as scheduled. The trial court did not abuse its discretion in striking Appellant's experts. Thus, affirmance is appropriate.

*C.* *Response to Additional Concurrences*

After circulating this concurring opinion, I received additional concurrences from other members of the court, two of which–Judge Gannam's and Judge Pratt's–were expressly relied upon by the majority. To ensure the timely and efficient issuance of this en banc opinion, I have not revised my opinion but instead am separately responding to the portions of the additional concurrences that directly or indirectly address points I have made above.

Judge Gannam provides a detailed analysis of Florida law relative to how dicta are discerned from holdings. Relative to the *Pedroza* test, he concludes that the Florida Supreme Court's holding on what constitutes a holding is in fact a holding. *Ante*, at 39 (Gannum, J., concurring) ("*Pedroza*'s new definitional test for holding is part of the opinion's holding because it was actually decided on the court's chosen decisional path of reasoning, leading from the case facts to the judgment." (citing *Pedroza*, 291 So. 3d at 547)). On this we agree as I have applied the *Pedroza* test in my concurrence as well.

Judge Gannam also concludes that decisions need not be limited to the narrowest possible reading of the law and facts, but, instead, we must look to the chosen decisional path of the opining court. *Id.* at 41-42 ("And if we determine the proposition was not necessary to the prior decision because the court *could* have ruled more narrowly or *also* ruled on a separate question that would have disposed

80

of the case by itself, we must still determine whether the proposition was nonetheless decided on the court's *chosen* decisional path from facts to judgment.") (emphasis in original). In other words, the Florida Supreme Court has the power to express whether it is more narrowly or more broadly addressing the issue before it. *Id.* at 36-37 ("They 'conclude[] as a normative matter that judges should be allowed to create holdings broader than necessary' and 'that judges are, in fact, allowed to do so in practice.'" (citing Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1058 (2005))). On this, as set forth in my concurrence above, I also agree.

Where I diverge from Judge Gannam's concurrence is in his application. Contrary to the majority, rather than reading *Binger*'s pronouncements relative to a trial court's exclusion of evidence as not part of the holding and "pure dictum," *ante*, at 13,[25] Judge Gannam concludes that a portion of *Binger* does in fact apply to exclusion decisions. *Ante*, at 43 ("The second <u>rule</u> [of *Binger*] proceeds from the first: "'It follows, of course, that a trial court can properly <u>exclude</u> the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly[.]'") (emphasis added) (quoting

---

[25] The majority also states: "In sum, *Binger* concerned undisclosed witness testimony that was improperly allowed and should have been excluded due to prejudice to the other party. *Binger* did *not* concern undisclosed testimony that was improperly excluded or what the trial court should have considered before excluding undisclosed testimony." *Ante*, at 12.

*Binger*, 401 So. 2d at 1313). Rather than denying that *Binger*'s holding applies to exclusion decisions, Judge Gannam asserts that *Binger* established one rule for when a trial court admits late-disclosed witnesses and a separate rule for when trial courts decide to exclude the same. He argues that the rule for admission requires consideration of prejudice to the objecting party: "*Binger* does require a trial court to consider prejudice to the objecting party before *allowing* undisclosed witness testimony." *Id.* at 42 (emphasis in original). However, Judge Gannam describes the rule for excluding as "begin[ing] and end[ing] with trial court discretion" with no requirement to consider prejudice to the objecting party. *Id.* at 43.

I cannot agree with Judge Gannam's conclusion that *Binger* contains two binding, alternate holdings relative to a trial court's decision to admit rather than exclude a late-disclosed witness. I do not see the *Binger* court anywhere laying out two separate rules as Judge Gannam proposes. Beyond that, as discussed more fully in section II(A)2.c. above, the *same, singular rule* which the court describes as applying to exclusion decisions was applied by the *Binger* court to the trial court's decision to admit. By applying the one and only rule it announced, the supreme court was making clear its chosen decisional path and the scope of its holding.

Finally, I cannot agree with Judge Gannam's reading of the following rule set forth in *Binger*:

> It follows, of course, that a trial court can properly exclude the testimony of a witness whose name has not been disclosed in

82

accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by a determination as to whether use of the undisclosed witness will prejudice the objecting party. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases).[10] If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

401 So. 2d at 1313-14 (internal citations omitted). While I concede there are a mixture of "musts" and "shoulds" in the court's pronouncement, it is clear in reading the opinion as a whole that the court was announcing a rule, not a suggestion. As the court states in its concluding paragraph, "Applying the above *rules* to the instant case . . . ." *Id.* at 1314 (emphasis added). The court then applies, point by point, the rule quoted above which it had just pronounced[26] and found that, "King Pest Control was prejudiced in the presentation of its case, and that the district court was correct in directing a new trial." *Id.* at 1315. This is the epitome of a holding, not dictum.

I make a final observation of Judge Gannam's concurrence where he speaks to an appellate court's ability to address the issues before it more narrowly or more

---

[26] A full discussion of the how the *Binger* court applied its prejudice test and accompanying factors is set forth in section II(A)2.c. above.

broadly depending on the court's chosen decisional path. I make a similar observation of Judge Pratt's concurring opinion in which he rightly observes that a decision must be tethered to its facts.[27] *Ante*, at 50 (Pratt, J., concurring). I cannot disagree that our supreme court could have opted to narrow its decision to one only applying to circumstances involving admission of late-disclosed witness testimony. It is a "fact" that the trial court opted to admit rather than exclude the particular

---

[27] While it is not necessary to engage in a deep dive on this point as the facts of *Binger* clearly involve a trial court's decision whether to admit or exclude evidence, I note that Judge Pratt indicates that although *Binger* was reviewed under conflict jurisdiction, the scope of the holding must be tethered to the facts in *Binger*:

> All that to say, as a general proposition, a statement by the supreme court in a conflict jurisdiction case—or any other case under article V, section 3(b)(3)-(4)—has to be tethered to the district court decision on review and the facts underlying that case in order for a statement to be a holding and not dicta under *Pedroza*. As applied to *Binger*, that means that a statement by the supreme court in *Binger* would need to be tethered to the Fourth District Court of Appeal's decision in *King Pest Control v. Binger*, 379 So. 2d 660 (Fla. 4th DCA 1980), and the facts underlying that case[.]

*Ante*, at 50-51 (Pratt, J., concurring) (footnote omitted). When considering matters of conflict jurisdiction, our supreme court has also looked at the facts and holdings of the conflict cases as well (Judge Pratt appears to largely agree with this per his discussion in the footnote deleted from the quote above). *See Love v. State*, 286 So. 3d 177 (Fla. 2019) (court considered both facts of the case under review as well as a discussion of factual background and holding of case in conflict); *Robinson v. State*, 329 So. 3d 103, 106-07 (Fla. 2021) (discussing the case under review as well as three certified conflict cases); *Totura & Co., Inc. v. Williams*, 754 So. 2d 671 (Fla. 2000) (discussing in depth both the consolidated cases under review as well as the facts of one of the certified conflict cases). I attempted to discuss the case on review as well as the conflict cases referenced in *Binger* in my analysis section above.

witness in question. However, viewed more broadly, it is equally a "fact" that the trial court was faced with a decision whether to admit or exclude a late-disclosed witness.

Thinking of these potential decisional paths in the form of flow charts, we could depict the narrower and the broader decisional paths as follows:

**Narrower View of Decisional Path**



**Broader View of Decisional Path**



The boxes depict the possible places upon the decisional path the *Binger* court could have opted to direct its holding, and both paths fall within the facts faced by the

*Binger* court. Thus, either are viable options for the breadth and application of the holding. The question simply becomes: What decisional path did the *Binger* court *choose*? Beyond the fact that the rule announced by the court clearly stated it applied to both admission as well as exclusion, the court's opening sentence in *Binger* is: "In this civil proceeding, we endeavor to reconcile conflicting district court decisions regarding the effect of a pretrial failure to disclose the names of witnesses." 401 So. 2d at 1311. That self-description by the Florida Supreme Court places it on the broad path, not the narrow one. I note that neither the majority nor any of the concurrences discuss the impact of the opening pronouncement in *Binger* court which reflects the breadth of the issue the opinion addresses. Nor is there any effort to refute the various portions of *Binger*, which I set out in detail in section II(A)2.a., which broadly describe the issue of the case as one of the "problem of pretrial witness disclosure" not an issue of admission versus exclusion. Nor is there any effort to analyze the conflicting cases the *Binger* court was attempting to reconcile. Nor is there any effort to refute that the Fourth District's opinion on review, *King Pest Control v. Binger*, expressly set forth a broad rule applicable to both exclusion as well as admission of late-disclosed witnesses:

> Should either party offer an unlisted witness, objection by the opposition requires the trial judge to determine whether the witness should be allowed. If no prejudice will accrue to the objecting party, the witness should be heard. On the other hand, if the objector will be prejudiced, then the court must determine whether the party offering the witness should have foreseen the eventuality of needing to call the

witness.

379 So. 2d at 663.

I do not believe this is a close call. The Florida Supreme Court had sufficient facts before it to take a broader – rather than a narrower – view of the question of exclusion versus admission of late-disclosed witnesses, and it clearly chose the broader path. The rule announced in *Binger* relative to determining prejudice to the objecting party applied to a trial court's decision when faced with late-disclosed

witnesses, guiding the trial court on whether to admit or exclude the same.[28]  This is

the binding holding of *Binger*.[29]

---

[28] Judge Gannam ends his concurrence with a footnote citation to *Dade County v. Brigham*, 47 So. 2d 602 (Fla. 1950), which he alludes stands for the proposition that the Florida Supreme Court can establish one test for allowance of a party's request and another for disallowance.  I do not believe *Brigham* stands for that proposition, but rather that the *Brigham* court held that a general rule of not allowing expert fees to be taxed as costs does not prohibit a later court from determining there to be an exception to the general rule.  *Id.* at 605 ("We sustained [in *Inland Waterway Development Co. v. City of Jacksonville*, 38 So. 2d 676 (Fla. 1948),] the invocation by the trial judge of the 'general rule' [of not treating expert fees as taxable costs] and his exercise of sound judicial discretion in applying it.  In this case we sustain the trial judge for recognizing an exception to the 'general rule' and *his* exercise of sound judicial discretion.").  There are numerous cases that establish a single decisional test for an issue without regard to the direction the lower court chose in the case before it.  For example, the three-factor test trial courts apply when deciding continuances is not dependent on whether the court grants or denies the continuance.  *See Dussan v. Zoghbi*, 359 So. 3d 388 (Fla. 3d DCA 2023) (applied three-factor continuance test and determined continuance was improperly denied); *Krock v. Rozinsky*, 78 So. 3d 38 (Fla. 4th DCA 2012) (applied three factor continuance test and determined continuance was improperly denied).  The test announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), for ineffective assistance of counsel applies equally upon review of decisions granting or denying such claims.  *See Wiggins v. Smith*, 539 U.S. 510 (2003) (finding ineffective assistance of counsel occurred utilizing the *Strickland* test); *Occhicone v. State*, 768 So. 2d 1037 (Fla. 2000) (finding there was no ineffective assistance of counsel under *Strickland*).  The test for retroactivity announced in *Witt v. State*, 387 So. 2d 922 (Fla. 1980), is the same whether finding for or against retroactivity.  *Phillips v. State*, 299 So. 3d 1013 (Fla. 2020) (finding retroactive application inappropriate under *Witt*); *Mosley v. State*, 209 So. 3d 1248 (Fla. 2016) (deeming retroactive application appropriate under *Witt*).  It is not outside the bounds of the facts of a case or jurisprudence of our courts for a single decisional test to be created in one appellate decision rather than requiring two cases, one of which the trial court ruled one direction and a second case ruling the other, to establish one complete test.

---

[29] Judge Gannam also cites a portion of the following paragraph from *Binger*, which he asserts to further show that *Binger*'s prejudice test need not apply when a trial court excludes a late-disclosed witness:

> We cannot talk about pretrial discovery without mentioning local pretrial practices. We have intentionally left room for the operation of local rules and customs within the broad parameters of our decision. Local customs regarding pretrial disclosure of witnesses vary throughout the circuits in Florida, and these variations can and should continue. For example, in some circuits the pretrial disclosure order not only directs that witnesses' names be exchanged, but expressly prevents the testimony of any witness not identified within a certain period of time. In other circuits, it is common for the order to exempt by category certain types of witnesses from being listed. Another local practice requires that counsel for each party demand witnesses' names before a court order is entered or in lieu of a court-directed exchange of names. These local variations in discovery practice within the circuits of Florida in no way derogate from our decision, and we leave their interpretation and application, within the stated goals of discovery, to the presiding trial judge in each case.

401 So. 2d at 1314 (footnote omitted). The same paragraph is cited in full by the majority. I agree with the majority that this paragraph is dictum. However, to the extent either the majority or Judge Gannam's concurrence contend this language modifies the clear holding of *Binger* as I have already discussed, I disagree with that premise for the following reasons.

First, this paragraph begins with an express limitation by the *Binger* court– that local rules and customs are permitted "*within* the broad parameters of our decision." *Id.* (emphasis added). The paragraph ends with a similar qualification: "we leave [the] interpretation and application [of local pretrial practices], *within* the <u>stated goals of discovery</u>, to the presiding trial judge in each case." *Id.* (emphasis added). Thus, whatever the implication of this paragraph, *Binger* has expressly stated those local practices must still fall "within" the parameters of the holding of *Binger*.

Second, both Judge Gannam and the majority read the following sentence, "For example, in some circuits the pretrial disclosure order not only directs that witnesses' names be exchanged, but expressly prevents the testimony of any witness

## III.  Conclusion

As I stated at the outset, my deeper concern in writing this concurrence is the potential diminishing effect the majority's opinion has on our state's highest court's ability to provide clear guidance to courts, the bar, and the people of our state about the law of our state in the opinions that it writes.  The *Binger* court clearly set out the issue it was addressing and that issue fell squarely within the facts of the *Binger* case—to resolve conflicting district court opinions and provide clarity to trial courts when faced with late-disclosed witness testimony.  While I share my colleagues' concerns about the sum effect of *Binger* over the last several decades on our trial courts, I believe the supreme court has always had the power to redirect the procedural path of our state through rule amendments.  That is in fact what the supreme court accomplished in 2025—giving trial courts both the power and duty to strictly enforce their pretrial orders and deadlines.  Attempting to "fix" *Binger* at this late stage not only diminishes our supreme court's authority to define the issues it faces, but it also creates unnecessary confusion in the law relative to the cases that

---

not identified within a certain period of time[,]" to mean that the *Binger* court is greenlighting strict enforcement of the pretrial orders without regard to prejudice to the objecting party or the other *Binger* factors.  When read in context, however, the *Binger* court was merely throwing out several scenarios for the timing and manner of witness disclosure, not dictating a new test for trial courts to apply when there is non-compliance with pretrial orders.  *Id.* (other examples of local discovery practices relative to timing and manner of witness disclosures were 1) requiring exchange of witness names before a court order is entered, and 2) pretrial orders that exempt certain types of witnesses from having to be disclosed).

were tried prior to the recent rule changes and are now pending on appeal throughout the state. For the reasons expressed above, I concur in result only with the majority's affirmance.

—————————————————————————

Warren B. Kwavnick, of The Law Office of Warren B. Kwavnick, PLLC, Pembroke Pines, for Appellant/Cross-Appellee.

Grace Mackey Streicher and Andrew A. Harris, of Harris Appeals, P.A., Palm Beach Gardens, and Jason D. Weisser and Gregory M. Cummings, of Schuler, Halvorson, Weisser, Zoeller, Overbeck & Baxter, P.A., West Palm Beach, for Appellee/Cross-Appellant.